**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SABBY VOLATILITY WARRANT MASTER FUND LTD., SZOP MULTISTRAT LP, ALTO OPPORTUNITY MASTER FUND-SPC-SEGREGATED MASTER PORTFOLIO B, HUDSON BAY MASTER FUND LTD. and WALLEYE OPPORTUNITIES MASTER FUND LTD, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** **JURY TRIAL DEMANDED** |
| KEVIN J. KENNEDY, PATRICK ARCHAMBAULT, JIM DISANTO, KAREN FRANCIS, TAMER HASSANEIN, LISA KELLEY, THOMAS M. ROHRS and TIANYUE YU, | |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiffs Sabby Volatility Warrant Master Fund Ltd., SZOP Multistrat LP, Alto

Opportunity Master Fund SPC-Segregated Master Portfolio B, Hudson Bay Master Fund Ltd.,

and Walleye Opportunities Master Fund Ltd (collectively "Plaintiffs") respectfully allege, upon

knowledge as to their own acts and upon information and belief as to the acts of others, as

follows:

INTRODUCTION

1.    Plaintiffs assert claims under the Securities Act of 1933 (the "Securities Act")

arising from a public offering of units of common stock and warrants ("Units") by Quanergy

Systems, Inc. ("Quanergy") that closed on November 2, 2022, and raised approximately $15.4

1

million (the "Offering"). The Offering was conducted pursuant to a registration statement declared effective by the Securities and Exchange Commission (the "SEC") on October 28, 2022 (the "Registration Statement"), and a final prospectus dated November 1, 2022 (the "Prospectus," and with the Registration Statement, the "Offering Documents").

2.      Plaintiffs in aggregate invested $8,610,000 and purchased a total of 5,070,000 Units in the Offering, which closed on November 2, 2022. Within four business days their investment was worthless. On November 8, 2022, the New York Stock Exchange ("NYSE") summarily delisted Quanergy's common stock due to the Company's failure to maintain $15 million average market capitalization for thirty days (the "$15 Million Requirement"). The specific risk of an immediate delisting based on the $15 Million Requirement was not disclosed in the Offering Documents. Nor did the Offering Documents disclose that the share price for Quanergy in the days after the Offering held the key to the Company's survival. A modest decline over just a few days would be fatal to its business, as it would trigger a mandatory, immediate delisting. This is precisely what happened in the four trading days after the Offering.

3.      The delisting made bankruptcy both inevitable and imminent. Just five weeks later, on December 13, 2022, Quanergy filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code without any plan to reorganize. Quanergy announced that it would sell substantially all of its assets, as a package or piecemeal, on an expedited basis.[1] The proceeds of the Offering were used, not for Quanergy's business plan, but to fund a bankruptcy fire sale. Plaintiffs, along with other equity holders, are almost certain to walk away empty-handed.

4.      Although the Offering Documents indicated that the Company would need to raise additional capital, they omitted critical information about Quanergy's failed attempts to

---

[1] The case is captioned *In re Quanergy Systems, Inc.*, Case No. 22-11305 (Bankr. D. Del.) (CTG) (the "Bankruptcy Case").

obtain debt financing in the weeks preceding the Offering. From late June and into September 2022, Raymond James & Associates, Inc. ("Raymond James"), a financial adviser to Quanergy, ran a comprehensive process to raise debt financing. Raymond James contacted 118 potential lenders, and engaged with 26 of them. Quanergy received no credible offer. Equity investors providing a lifeline to a Company in need of debt capital would surely have found highly material the fact that the Company had already unsuccessfully scoured the market for a loan.

5.     The Offering Documents also do not disclose that Raymond James concurrently conducted a comprehensive sales process to locate buyers for Quanergy. Raymond James contacted at least 36 prospective buyers for a going concern transaction, and eight parties signed an NDA. Again, Quanergy received no credible offer. An equity investor would surely have found this information material as it made clear that the Company's equity was essentially worthless.

6.     The harsh truth was that Quanergy had already been rejected by every possible lender and every possible buyer. To make matters worse, the Company faced the risk of an immediate delisting within days, an event that would lead to a swift liquidation. The Offering did not fairly disclose the bleak reality that Quanergy confronted.

7.     The Offering Documents thus did not state the risk that even with the Offering proceeds, the Company would have less than six weeks of operating expenses, or disclose in the "Use of Proceeds" section that the Offering proceeds would likely be used to fund a liquidation in bankruptcy or pay the bankruptcy advisers that Quanergy had quietly retained months earlier.

8.     The Offering Documents also implied that the Company had a lifeline through a $125 million equity line of credit facility, of which $113.4 million remained untapped. But upon the delisting, this source of funds was cut off.

3

9.      While the Offering Documents do not mention Raymond James, the strategic process or Quanergy's failure to attract any offers or the imminent risk of delisting due to failure to meet the NYSE's $15 million listing standard, these exact matters are the rationale for the fire-sale liquidation that was scheduled for January 23, 2023.

10.      Plaintiffs thought that they were providing a lifeline to Quanergy, which might leverage the capital raised in the Offering to obtain further financing and develop a valuable Light Detection and Ranging ("LIDAR") business. They were not told that Quanergy had already hit the proverbial iceberg and there were no viable alternatives to right the sinking ship, and no lifeboats for its unfortunate shareholders.

11.      Thus, the Offering Documents contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and/or failed to make adequate disclosures otherwise required regarding the status of those applications. These errors did not arise from a fraudulent scheme, but rather from severe errors in judgment. Upon information and belief, the defendants, who were Quanergy's executive officers and directors at the time of the Offering and signed the Offering Documents, also failed to review them with care to assure that their contents were complete and accurate.

12.      As a result of these untrue and misleading statements and omissions, and the resulting decline in the market value of Quanergy's stock, Plaintiffs have suffered significant losses and damages.

<u>JURISDICTION AND VENUE</u>

13.      The claims asserted in this Complaint arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

14.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.    This Court has personal jurisdiction over the Defendants because this action arises under federal law, and Section 22 of the Securities Act (15 U.S.C. § 77v) authorizes nationwide service of process.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v). The Offering was underwritten by Maxim Group ("Maxim"), which maintains its corporate headquarters at 300 Park Avenue, New York, NY 10022. Plaintiffs purchased the shares underlying this action as part of the Offering through Maxim. Therefore, this district where the offer or sale of the securities underlying this action took place.

## PARTIES

17.    Plaintiff Sabby Volatility Warrant Master Fund Ltd. ("Sabby") is a company formed under the laws of the Cayman Islands.

18.    Plaintiff SZOP Multistrat LP ("SZOP") is a limited partnership organized under the laws of Delaware.

19.    Plaintiff Alto Opportunity Master Fund SPC-Segregated Master Portfolio B ("Alto") and is a Cayman Islands exempted company.

20.    Plaintiff Hudson Bay Master Fund Ltd. ("Hudson Bay") is a company formed under the laws of the Cayman Islands.

21.    Plaintiff Walleye Opportunities Master Fund Ltd ("Walleye") is a company formed under the laws of the Cayman Islands.

22.    Non-party Quanergy Systems, Inc. is a Delaware corporation with its principal place of business in Sunnyvale, California. Quanergy's shares of common stock currently trade on the OTCMKTS under the symbol "QNGYQ." On February 8, 2022, Quanergy became a public company through a merger with CITIC Capital Acquisition Corp. ("CITIC"), a special purpose acquisition company ("SPAC"), and CITIC's wholly-owned subsidiary CITIC Capital

11930101-7

Merger Sub Inc. (the "Merger"; the pre-merger operating company is referred to as "Legacy Quanergy").

23.　　Defendant Kevin Kennedy served, at all times relevant to the claims alleged in this Complaint, as Quanergy's Chief Executive Officer ("CEO") and Chairman of the Board and signed the Registration Statement either personally or by attorney-in-fact. Mr. Kennedy served as CEO and Chairman of Legacy Quanergy's Board from March 2020 until the Merger. As of August 5, 2022, Mr. Kennedy beneficially owned 2.3% of Quanergy's common stock. On December 31, 2022, Mr. Kennedy resigned as CEO, receiving a $285,000 lump sum payment. He remains on the Board.

24.　　Defendant Patrick Archambault served, at all times relevant to the claims alleged in this Complaint, as Quanergy's Chief Financial Officer ("CFO") and signed the Registration Statement either personally or by attorney-in-fact. Mr. Archambault served as Legacy Quanergy's CFO from July 2019 until the Merger, having previously served as Legacy Quanergy's Vice President of Finance from November 2017 to July 2019 and Director of Strategic Financial Planning from October 2016 to October 2017.

25.　　Defendant Jim DiSanto served, at all times relevant to the claims alleged in this Complaint, as one of Quanergy's Directors and on the Audit Committee and on the Board of Legacy Quanergy from 2013 to 2015 and from November 2018 until the Merger. Mr. DiSanto signed the Registration Statement either personally or by attorney-in-fact.

26.　　Defendant Karen Francis served, at all times relevant to the claims alleged in this Complaint, as one of Quanergy's Directors and as Chair of the Nominating and Corporate Governance Committee and on the Board of Legacy Quanergy from September 2018 to

6

December 2019 and from September 2021 to the Merger. Ms. Francis signed the Registration

Statement either personally or by attorney-in-fact.

27.    Defendant Tamer Hassanein served, at all times relevant to the claims alleged in

this Complaint, as one of Quanergy's Directors and on the Board of Legacy Quanergy from 2014

to September 2018 and from March 2020 to the Merger. Mr. Hassanein signed the Registration

Statement either personally or by attorney-in-fact. As of August 5, 2022, Mr. Hassanein

beneficially owned 5.2% of Quanergy's common stock. He is a General Partner of Rising Tide, a

venture capital firm, which was beneficial owner of approximately 25% of Quanergy's common

stock upon the closing of the Merger, and of 16.5% as of August 5, 2022.

28.    Defendant Lisa Kelley served, at all times relevant to the claims alleged in this

Complaint, as one of Quanergy's Directors and as Chair of the Audit Committee. Ms. Kelley

signed the Registration Statement either personally or by attorney-in-fact. Ms. Kelley resigned

from the Board on December 12, 2022.

29.    Defendant Thomas M. Rohrs served, at all times relevant to the claims alleged in

this Complaint, as one of Quanergy's Directors and on the Audit Committee and the Nominating

and Corporate Governance Committee and on the board of directors of Legacy Quanergy from

January 2020 until the Merger. Mr. Rohrs signed the Registration Statement either personally or

by attorney-in-fact.

30.    Defendant Tianyue Yu served, at all times relevant to the claims alleged in this

Complaint, as Quanergy's Chief Development Officer. Dr. Yu co-founded Legacy Quanergy in

2012 and served as Legacy Quanergy's Vice President of Products from February 2014 to May

2018, Chief Technology Officer from May 2018 to February 2020, and Chief Development

Officer from February 2020 until the Merger. Dr. Yu signed the Registration Statement either

personally or by attorney-in-fact. As of October 24, 2022, Dr. Yu beneficially owned 2.9% of Quanergy's common stock

31.    Kevin Kennedy, Patrick Archambault, Jim DiSanto, Karen Francis, Tamer Hassanein, Lisa Kelley, Thomas M. Rohrs and Tianyue Yu are collectively referred to in this Complaint as "Defendants," and Mr. Kennedy, Mr. DiSanto, Ms. Francis, Mr. Hassanein, Ms. Kelley, Mr. Rohrs and Dr. Yu are collectively referred to in this Complaint as the "Director Defendants."

## FACTS GIVING RISE TO THIS ACTION

A.    Corporate Background

32.    In the Offering Documents, Quanergy describes itself as "a leading provider of Light Detection and Ranging ('LiDAR') and three dimensional ('3D') perception software solutions." The Offering Documents explain that LiDAR "is a real-time sensing technology that determines the shape and contour of physical objects in the environment using a technique known as time of flight, which measures the time a laser beam travels to and from a specific object. 3D perception software interprets measurement data from LiDAR sensors."

33.    The Offering Documents further explain the importance of this technology:

> Our LiDAR and 3D perception software solutions are designed to provide visualization and automation of applications in a wide range of industries, leading to greater efficiency, safety and improved operational outcomes. We believe LiDAR and 3D perception technologies have the potential to fundamentally transform how machines interact with humans, unleashing new levels of productivity, and in the process, creating significant revenue potential for LiDAR solution suppliers like us. According to third-party estimates aligned with our own, the global LiDAR market is forecasted to reach approximately $27.2 billion by 2030.

34.    According to the Offering Documents, the Company's business focus is on the Internet of Things ("IoT") market:

> IoT refers to a network of physical objects that are embedded with sensors, software and communications capabilities for the purpose of connecting and exchanging data with other devices and systems over the Internet…. These applications generally operate in real-time and have high-value, mission-critical characteristics. We are also developing technology for the automotive market…. We have a balanced business strategy focused on both the IoT market, which exists at scale today, and the automotive market, which is more nascent and is expected to scale over time.

35.     In the Offering Documents, Quanergy describes its M Series of LIDAR sensors as offering "industry leading range, accuracy, resolution and field of view compared to competitive offerings," and that the Company's "ability to mix and match the optimal hardware-software combination to meet our customers' perception and automation needs is unique in the industry."

36.     On February 8, 2022, as a result of the Merger, Quanergy became a public company listed on the NYSE.

37.     In tandem with the Merger, Quanergy closed a private placement of common stock and announced a $125 million equity line of credit facility with Global Emerging Markets Group ("GEM"). The private placement permitted Quanergy to pay down $35 million of outstanding convertible notes and accrued interest, extinguishing the Company's secured debt. The Company disclosed that it intended to use the proceeds from the sale of shares to GEM through the equity line for general corporate purposes and other working capital needs.

38.     Under the Share Purchase Agreement between the Company and GEM dated December 12, 2021 (as amended, the "GEM Agreement"), the Company represented that it would comply with the NYSE's listing standards and agreed that it had a continuing obligation to maintain its listing as a condition precedent to any drawdown on the equity line.

B.     <u>Quanergy's Declining Liquidity and Efforts to Maintain Its NYSE Listing</u>

39.     Between February 2, 2022, the closing date of the Merger, and May 31, 2022, Quanergy's common stock dropped from $6.97 to $0.51 per share.

40.    During the months following the Merger, the Company disclosed that it faced a number of challenges, including an adverse outcome to patent litigation with a competitor and increased competition.

41.    On May 23, 2022, the Company announced that it would draw down $9.9 million on its $125 million share subscription facility with GEM, which was settled on July 25, 2022.

42.    On June 17, 2022, the Company announced that it had received a notice of delisting from the NYSE under Section 802.01C of the NYSE Listed Company Manual (the "NYSE Manual") due to the average closing price falling below $1.00 for a 30-day consecutive period (the "$1.00 Price Requirement"). The Company further announced that it intended to cure the deficiency within the six-month cure period provided under the NYSE's listing standards

43.    On July 25, 2022, the Company announced that it had received a notice of delisting from the NYSE under Section 802.01B of the NYSE Manual due to the failure to maintain an average market capitalization of $50 million over a 30-day consecutive trading period (the "$50 Million Requirement"). The Company further announced that it intended to cure the deficiency within the eighteen-month cure period provided under the NYSE listing standard.

44.    On August 17, 2022, the Company delivered a second drawdown notice to GEM, which settled on October 3, 2022, with the issuance of 320,000 shares of common stock for an aggregate purchase price of $1.7 million.

45.    In order to increase the Company's stock price and achieve compliance with the $1.00 Price Requirement, the Director Defendants adopted resolutions, subject to stockholder approval, to amend the Certificate of Incorporation to effect a reverse split of Common Stock at a ratio in the range of one-for-ten to one-for-twenty, such ratio to be determined in the Board's

discretion of our Board. The Company noticed a special meeting of stockholders for October 3, 2022, at which it obtained the stockholder approval.

46.　　On October 6, 2022, the Company effected a reverse 1-20 split, which momentarily brought its stock price above $3.50 and back into compliance with the $1.00 Price Requirement.

47.　　On October 13, 2022, the Company announced that it was also taking measures to preserve capital resources and implemented a restructuring plan. According to the Offering Documents:

> Due to market conditions and after an extensive review of our organization and programs, on October 3, 2022, we implemented a restructuring plan, including a reduction in staff.
>
> Under the restructuring program, we have focused our solid state engineering resources on the design of a second-generation, high-resolution [optical phased array ("OPA")] architecture, and we have ceased development of our initial solid state OPA architecture, resulting in a reduction in our engineering staff and associated expenditures. In connection with this restructuring plan we will reduce staff by 11%.… We expect to substantially complete this workforce reduction by the end of October 2022. These actions are expected to reduce our expenses and extend our cash runway.

48.　　Despite the announced restructuring effort, Quanergy's stock price and market capitalization continued to fall, dropping below $2.50 and $15 million on October 11, 2022.

C.　　The Retention of Raymond James and the Failed Effort to Obtain Debt Financing

49.　　In June 2022, the Director Defendants determined that it was necessary to explore strategic alternatives to preserve its liquidity, maintain its operations, and maximize value for its stakeholders. To facilitate this process, on June 29, 2022, the Company retained Raymond James to explore and evaluate strategic alternatives, including a business combination transaction (i.e., a sale to a third party as a going concern) and a financing transaction (i.e., a capital raise of

11930101-7

structured private debt). Neither Raymond James' retention nor the sale was disclosed in any of Quanergy's public filings until long after the Offering's close.

50.     The bulk of Raymond James' efforts were directed to raising capital through a debt financing.

51.     Starting around July and continuing into September 2022, Raymond James launched a multi-pronged outreach effort to 118 potential debt financing parties, which covered the universe of possible lenders and transaction types. Of the 118 potential lenders, 58 were venture debt and other parties that could be interested in taking a longer-term growth outlook on an investment opportunity with Quanergy; the remaining 60 potential debt financing parties included distressed or opportunistic lenders. Conversations with lenders explored a variety of structuring alternatives, including whether they may be interested in supporting a strategic transaction. Discussions also included the topic of bankruptcy reorganization with a possible debtor-in-possession financing facility.

52.     Raymond James held diligence calls with 26 parties to review the opportunity and answer questions, and 24 entered into non-disclosure agreements ("NDAs") with Quanergy. Parties to the NDA gained access to a comprehensive 163-document data room, including a 25-page Confidential Information Memorandum ("CIM").

53.     The outreach was a failure, and none of the parties under NDA ultimately submitted a credible debt-financing proposal. Quanergy's failure to obtain debt capital in the weeks preceding the Offering was not disclosed to Plaintiffs.

54.     In parallel with the search for debt capital, the Director Defendants explored the sale of the entire company. From June through August, the Company, with the assistance of

Raymond James, explored potential merger transactions with selected LiDAR market participants.

55.    In and around August 2022, the Company, with the assistance of Raymond James, began a broader outreach to potential counterparties for a going-concern sale. This phase of the marketing process included outreach to 36 prospective buyers for a going-concern transaction, 27 of which Raymond James held preliminary diligence calls with to review the opportunity and answer questions. Eight (8) parties entered into NDAs with Quanergy. No party submitted a credible proposal.

56.    Thus, by the end of September 2022, the Company, with Raymond James' assistance, had scoured the market for a loan without any takers, and potential strategic buyers had placed little or no economic value on the Company's technology or in the Company's equity value. None of this information was disclosed to Plaintiffs

57.    With the collapse of Raymond James' efforts, Quanergy took concrete steps to prepare bankruptcy filings.

58.    In late September 2022, the Company retained the law firm Young Conaway Stargatt & Taylor LLP ("Young Conaway"). Young Conaway had not previously served as counsel to Quanergy and was retained in connection with bankruptcy or liquidation. In October 2022, Young Conaway was paid $200,000 in retainers to prepare for the filing of a petition.

59.    Also in late September 2022, the Company hired one of the premiere bankruptcy advisory firms, FTI Consulting, Inc. ("FTI"). FTI's work included assisting management with managing and forecasting the Company's liquidity position, preparing for a chapter 11 filing and first day relief, and other financial analysis and planning

60.     In the month before the Offering's close, Young Conaway and FTI invoiced Quanergy hundreds of thousands of dollars for their work, work that is not alluded to in the Offering Documents.

D.     The Offering

61.     In late July 2022, the Company retained a second financial adviser, Maxim, to evaluate the Company's ability to raise equity through a public offering. Maxim's retention was part of the larger process led by Raymond James, with a goal of raising funds sufficient to allow for the funding of on-going operations while the Debtor continued to look for long term solutions to address its liquidity constraints.

62.     In contrast to the retention of Raymond James, Maxim's retention was disclosed by Quanergy when it filed the Form S-1 containing the preliminary prospectus with the SEC on September 14, 2022.

63.     On November 1, 2022, Quanergy announced the pricing terms of a public offering. The offering resulted in the sale of 9,800,000 units, with each unit consisting of one share of common stock, par value $0.0001 per share (the "Common Stock") and two warrants to purchase one share of Common Stock (the "Unit Warrants" and, together with the shares of Common Stock underlying such Unit Warrants, the "Units") at a public offering price of $1.70 per Unit. Each Unit Warrant had an exercise price of $1.70 and was to be exercisable for one share of Common Stock with a term of five years following the issuance date.

64.     The Offering was underwritten by Maxim, which acted as sole book runner.

65.     The Offering was conducted pursuant to the Registration Statement filed with the SEC on September 14, 2022, as amended on October 24, 2022, and corrected on October 28, 2022, and a final Prospectus dated November 1, 2022. The Registration Statement became effective on October 28, 2022.

66.    Sabby participated in the Offering and received an allocation of 1,600,000 Units priced at $1.70 per Unit, for a total investment of $2,720,000. Sabby's purchase was issued pursuant and traceable to the Offering because Sabby purchased its Units directly in the Offering.

67.    Hudson Bay participated in the Offering and received an allocation of 1,175,000 Units priced at $1.70 per Unit, for a total investment of $1,997,500. Hudson Bay's purchase was issued pursuant and traceable to the Offering because Hudson Bay purchased its Units directly in the Offering.

68.    SZOP participated in the Offering and received an allocation of 1,125,000 Units priced at $1.70 per Unit, for a total investment of $1,912,500. SZOP's purchase was issued pursuant and traceable to the Offering because SZOP purchased its Units directly in the Offering.

69.    Alto participated in the Offering and received an allocation of 585,000 Units priced at $1.70 per Unit, for a total investment of $994,500. Alto's purchase was issued pursuant and traceable to the Offering because Alto purchased its Units directly in the Offering.

70.    Walleye participated in the Offering and received an allocation of 585,000 Units priced at $1.70 per Unit, for a total investment of $994,500. Walleye's purchase was issued pursuant and traceable to the Offering because Walleye purchased its Units directly in the Offering.

71.    The Common Stock and Unit Warrants purchased in the Offering by Plaintiffs were issued pursuant and traceable to the Offering because Plaintiffs purchased the Units directly in the Offering.

E.      Untrue and Misleading Statements in the Offering Documents[2]

72.      The Offering Documents contained untrue statements of material fact, omitted

material facts necessary to make the statements contained in them not misleading, and omitted to

state material facts required under the statute, rules, and regulations governing the preparation of

public offering documents for securities.

- The Misleading Omission of the Risk of Delisting Due to Failure to Meet the NYSE's
  $15 Million Capitalization Requirement

73.      Under the subheading "***There can be no assurance that we will be able to comply***

***with the continued listing standards of NYSE***," the Offering Documents describe the

"significant material adverse consequences," which may include "reduced liquidity for our

securities" and "a decreased ability to issue additional securities or obtain additional financing in

the future," if the Company's stock is delisted.

74.      Under the subheading, "***Our failure to meet the continued listing requirements***

***of NYSE could result in a delisting of our securities***," the Offering Documents describe the

written notices received from the NYSE on June 17, 2022, and July 25, 2022, which,

respectively, stemmed from Quanergy's failure under Section 802.01C of the NYSE Manual to

maintain the $1.00 Price Requirement over a period of 30 consecutive trading days, and Section

802.01B to maintain the $50 Million Requirement over a consecutive 30 trading-day period. The

Offering Documents further describe that Quanergy had six months from the date of notice to

cure the Section 802.01C deficiency and eighteen months to cure the Section 802.01B

deficiency, that Quanergy had provided the NYSE with notices to cure both deficiencies and had

submitted a plan to the NYSE to cure the Section 802.01B deficiency.

---

[2] Unless otherwise stated, the untrue and misleading statements and omissions within the Offering Documents
discussed in this Complaint are reflected in both the Registration Statement *and* the Prospectus.

11930101-7

75.    The Offering Documents omit, however, that Quanergy faced a third, even more immediate threat of delisting under Section 802.01B: the $15 Million Requirement. That standard requires a listed company to maintain an average global market capitalization of at least $15,000,000 over a consecutive 30 trading-day period. Section 802.01B states:

> [T]he Exchange will promptly initiate suspension and delisting procedures with respect to a company … if a company is determined to have average global market capitalization over a consecutive 30 trading-day period of less than $15,000,000, regardless of the original standard under which it listed.

76.    The $15 Million Requirement carried a far greater risk to Quanergy than the $1.00 Price Requirement and $50 Million Requirement because it has no cure period and a breach leads to immediate suspension and delisting.

77.    In the 30 trading days prior to the filing of the Prospectus (at 11:54 p.m., on October 31), the closing price of Quanergy's stock price fell from $4.34 (September 20) to $1.05 (October 31). This caused the daily market capitalization to fall from $26.2 million (September 20, 2022) to $6.3 million (October 31, 2022). [3]



---

[3] The Offering Documents state that Quanergy had 6,032,381 shares issued and outstanding on August 5, 2022. All share prices reflect the reverse split.

78.     On October 11, 2022, Quanergy's stock closed at $2.48 a share and the market capitalization of the Company for that day fell below $15 million, to $14.6 million.

79.     Over the next fifteen trading days, the share price continued its descent, steadily pulling down the 30-day average market capitalization. On the date that the Prospectus was filed, the stock closed at $1.05 a share. The average market capitalization for the period of October 11 to October 31, 2022, was just $10,279,177.  Unless the average market capitalization for the next fifteen trading days (November 1 to November 21) exceeded $19.7 million, which required the Company to maintain a post-closing price over $1.25, the Company would fall out of compliance with the $15 Million Requirement within a matter of days.



80.     On eve of the Offering's closing, November 1, 2022, the stock moved in the opposite direction, closing down at $0.99 a share. Quanergy had now traded below the $15 million capitalization level for 15 of 30 trading days, and for this 30-day period had an average market capitalization of $16,576,179. Looking at the 15 days prior to the Offering, the average market capitalization had dropped to $9,702,482. The continuation of these depressed prices made it extraordinarily difficult to meet the NYSE $15 Million Requirement.

11930101-7

81.    The viability of Quanergy depended entirely on increasing its stock price to a level sufficient to overcome the 15-day shortfall in meeting the $15 Million Requirement—and doing so in the few days. Even if the stock price had remained static at the $1.05 closing price on October 31, the Company would fail to meet the $15 Million Requirement on November 9. A modest decline in share price in the days after the Offering would quickly prove fatal. This is precisely what occurred.



82.    In the three trading days after the Offering, Quanergy's share price dropped to $0.74 (November 7, 2022), and the 30-day average capitalization to $14.9 million. The next day, November 8, 2022, NYSE immediately delisted Quanergy.

83.    The delisting, and the attendant impairment of the Company's access to capital, led directly to the initiation of the Bankruptcy Case. Yet the risk of delisting for failure to meet the $15 Million Requirement is nowhere mentioned in the Offering Documents.

Even As the Offering Documents Disclosed the Need to Raise Capital, They Misleadingly
Omitted Raymond James' Retention and That the Effort to Secure Debt Financing Had Failed

84.    The Offering Documents made clear that Quanergy required additional capital to pursue its business plan.

19

85.    For example, under "Liquidity and Capital Resources," the Company disclosed

that since its inception, "it has financed operations primarily through the sale of shares of

common stock, preferred stock and convertible notes," that "[w]e expect to continue to incur

operating losses for at least the next 12 months due to the investments that we intend to make in

our business and, as a result, we will require additional capital resources to grow our business."

86.    Note 1 to the financial statements, which are annexed to the Offering Documents,

provides further detail, stating:

> The Company has had recurring losses and an accumulated deficit
> since its inception. The Company obtained additional funding of
> $43.8 million in connection with the Business Combination and
> effectively settled its outstanding debt balance of $106 million,
> thereby providing the Company with additional future financial
> flexibility. The Business Combination also gives the Company
> access to $125 million from a previously announced share
> subscription facility from [GEM].... Should the company be
> unable to access the GEM facility, it would be forced to seek other
> forms of financing which may not be available in sufficient
> amounts to fund its operations. These conditions raise substantial
> doubt about the Company's ability to continue as a going concern,
> for a period of twelve months following the date of issuance of
> financial statements as of and for the six months ended June 30,
> 2022.

87.    The captions to the risk factors in the Offering Documents tell a similar tale,

warning of the need to raise capital – and possible difficulty in successfully doing so – as

follows:

> ***Even if we issue all of the Units that we are offering
> pursuant to this prospectus, we will have less than three months
> of operating expenses on hand. We will require additional capital
> to meet our financial obligations and support planned business
> growth, and this capital might not be available on acceptable
> terms or at all.***
>
> Historically, we have funded our operations since inception
> primarily through equity, and equity-linked notes.... Even if we
> issue all of the Units that we are offering pursuant to this
> prospectus, we will have less than three months of operating

expenses on hand. Accordingly, we will need to engage in near term equity or debt financings to secure additional funds. If we raise additional funds through future issuances of equity or convertible debt securities, our then existing stockholders could suffer significant dilution…..

Because our decision to issue securities or raise financing in the future will depend on numerous considerations, including factors beyond our control, we cannot predict or estimate the amount, timing or nature of any future issuances of debt or equity securities. In addition, our ability to raise capital under the [GEM Agreement] is limited by trading volume and our aggregate market capitalization, each of which may inhibit our ability to maximize that facility in the near term. Our stockholders bear the risk of future issuances reducing the value of our Common Stock and diluting their interests. We may not be able to obtain additional financing on terms favorable to us, if at all. If we are unable to obtain adequate financing or financing on terms satisfactory to us when we require it, our ability to continue to support our business growth and to respond to business challenges could be significantly impaired, our business may be harmed and/or we may be forced to cease operations.

(Emphasis in original).

88.    With these and other related disclosures, investors in the Offering were put on notice that Quanergy would likely follow the Offering with an effort to raise additional capital.

89.    The Offering Documents, however, omit any reference to the fact that Quanergy had hired Raymond James as a financial advisor just weeks earlier, that Raymond James had scoured the market of potential lenders, but the effort to secure debt financing had failed.

90.    Thus, the Offering Documents make no reference to Raymond James' multi-pronged outreach effort to 118 potential debt financing parties, which included 58 venture firms and 60 distressed or opportunistic lenders. Nor is there any disclosure of the fact that 26 parties engaged in substantive due diligence with the Company, with 26 parties participating in diligence calls and 24 parties entering into NDAs and receiving access to a comprehensive data room and 25-page CIM. And the Offering Documents omit that none of the parties under NDA,

who had access to confidential information not available to investors such as the Plaintiffs, deemed Quanergy to be credit worthy or made a credible offer to the Company.

91.    Moreover, while the Offering Documents provide a description of Maxim's role, that description is misleadingly limited and incomplete. For example, the Offering Documents, under the heading "Underwriting," describe Maxim's retainer as underwriter and its commitment "to buy all of the Units if they buy any of them." The form of retainer letter between Maxim and the Company, attached as Exhibit 1.1 to the Registration Statement, is limited to Maxim's services as underwriter in the Offering.

92.    There is no indication that Maxim was first retained in July 2022, as part of the larger process led by Raymond James. There is no indication of the concurrent effort to secure debt financing, and that that effort had utterly failed. Instead, the Offering Documents misleadingly present the effort to secure additional financing as on the horizon, "we will need to engage in near term equity or debt financings to secure additional funds."

93.    The omission of the failed Raymond James process and Maxim's involvement was material. While investors understood that the Company would be seeking additional funding, they were not informed of Raymond James' retention, its comprehensive effort to locate debt financing, or the larger effort to sell the Company. Although the Offering Documents make clear that the Company would need to raise additional capital through a debt or equity offering, they nowhere state that the Company had already spent three months unsuccessfully seeking to do so. Instead, in multiple places, the Offering Documents suggest that this process is one that has yet to take place.

94.    The Offering Documents omit the very information deemed material and necessary that was later used to justify the liquidation of the Company's assets at auction on

January 23, 2023. Yet investors were deprived of this critical context, and invested without knowing that the Company had already scoured the debt market.

<u>Even As the Offering Documents Touted Quanergy's Technology, They Misleadingly Omitted The Lack of Interest by Any Strategic Partners in any "Going Concern" Transaction</u>

95.    The Offering Documents describe the Company as a "leading provider" of LIDAR technology and 3D perception software solutions, "having application in a wide range of industries, and having "the potential to fundamentally transform how machines interact with humans." The Offering Documents position Quanergy as having a "unique" position in the industry, stating, "We believe our ability to mix and match the optimal hardware-software combination to meet our customers' perception and automation needs is unique in the industry," and, "We believe our 3D perception software capability is unique in the industry and further differentiates our solutions from existing sensing technologies."

96.    In addition, the Offering Documents situate Quanergy amidst its competition. While noting that the "market for LiDAR and 3D perception solutions is highly competitive, rapidly evolving and at an early stage of development" and supplying a number of competitive factors, the Offering Documents state the Company's view that "we compete favorably with respect to most of these factors, including the technical attributes of our solutions. In particular, we believe that our IoT sensor performance, 3D perception software intelligence and balanced focus on the automotive and IoT markets distinguishes us from our competitors. However, we must make investments in order to further develop our market presence, customer base and brand."

97.    Thus, while the Offering Documents make clear Quanergy's need to raise capital beyond the funds to be raised in the Offering and that "[**i]nvesting in our securities involves a high degree of risk**," that discussion was partnered with substantial discussion of Quanergy's

"unique" and "leading" technology offerings. (Emphasis in original.) The value of the technology and commercial ability to exploit it drive the rationale for making a risky investment.

98.     The Offering Documents omit, however, information critical for evaluating the worth of the technology: that none of the counterparties approached by Raymond James regarding a merger transaction or a going concern-sale placed any value on the business.

99.     The Offering Documents do not disclose that from June to August 2022, Quanergy, with Raymond James' assistance, explored potential merger transactions with selected LiDAR market participants.

100.     The Offering Documents also omit that, beginning in late August 2022, Raymond James reached out to 36 potential counterparties for a going-concern sale, including other LiDAR providers and also other prospects that could potentially leverage the Debtor's sensors and software in other markets, that of the 36 prospective buyers, Raymond James held 27 due diligence calls and 8 parties entered into NDAs and that none of these efforts resulted in a credible offer.

101.     Given that the Offering Documents specifically name Quanergy's 10 main competitors under "Our Competition," it appears that Raymond James, by contacting at least 36 parties, exhausted the list of possible, likely buyers.

102.     The lack of any serious offers signaled that Quanergy could not be sold – even at its highly depressed stock price – as a company, and, therefore, that the equity was essentially worthless. The fact that the potential buyers contacted by Raymond James included Quanergy's competitors in LIDAR technology, who all passed, raises substantial questions about the value of Quanergy's technology. There is no disclosure that Quanergy had already engaged in a sales process or that with at least 36 buyers, including Quanergy's competitors, already tapped, there

24

were no more suitors for the Company. The Offering Documents, however, did not contain any information about the failed sales process, and without this information, the Offering Documents were materially misleading.

The Misleading Omission of the Immanent Unavailability of the GEM Credit Facility

103.    In the Offering Documents, the Company describes its entry into the GEM Agreement, stating that, "We are entitled to draw down up to $125 million of gross proceeds ("Aggregate Limit") in exchange for shares of our Common Stock, at a price equal to 90% of the average closing bid price of the shares of our Common Stock on the NYSE for a 30-day period, subject to meeting the terms and conditions of the GEM Agreement." The Offering Documents further disclose that on May 20, 2022, the Company drew down $9.9 million, and on August 7, 2022, $1.7 million under the GEM Agreement.

104.    The Offering Documents indicate that, as of the Offering, $113.4 million of financing available remained available to Quanergy under the GEM Agreement, subject to meeting the terms and conditions of the GEM Agreement. There is no indication that the Company was not in compliance with the terms and conditions as of that date.

105.    The Offering Documents disclose, under the heading "***Even if we issue all of the Units that we are offering pursuant to this prospectus, we will have less than three months of operating expenses on hand. We will require additional capital to meet our financial obligations and support planned business growth, and this capital might not be available on acceptable terms or at all***," that the Company's "ability to raise capital under the [GEM Agreement] is limited by trading volume and our aggregate market capitalization, each of which may inhibit our ability to maximize that facility in the near term." (Emphasis in original.)

106.    The Offering Documents, however, fail to state what those trading volume and aggregate market capitalization limits are, whether the Company had breached, or was close to

breaching those limits, or whether the Company was at risk of breaching any of its other covenants with GEM.

107.    The Offering Documents should have provided that material information because Note 1 to the Financial Statements, which are attached to the Offering Statements, states: "Should the company be unable to access the GEM facility, it would be forced to seek other forms of financing which may not be available in sufficient amounts to fund its operations."

108.    Under the terms and conditions for drawdowns in the GEM Agreement, the Company was required to "to effect the listing or trading of its Common Shares," to "comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules or the [NYSE], and "[t]rading in the Shares shall not have been suspended by the Commission or [NYSE]."

109.    As alleged above, the Company faced instant suspension and delisting of its stock by the NYSE due to the failure to meet the $15 Million Requirement. But the Company's descriptions of the risk of delisting under the risk factors – "***There can be no assurance that we will be able to comply with the continued listing standards of the NYSE***" and "***Our failure to meet the continued listing requirements of NYSE could result in a delisting of our securities***" – do not include that particular threat although such threat was known or knowable as of November 1, 2022, or the specific risk that delisting would make the GEM credit facility unavailable. (Emphasis in original).

110.    Instead, the Company only warns in vague terms that delisting will impact its ability to access capital, stating, that it would result in "[a] decreased ability to issue additional securities or obtain additional financing in the future" and that, "A delisting of our Common Stock from the NYSE could negatively impact us as it would likely reduce the liquidity and

11930101-7

market price of our Common Stock and thus (i) reduce the number of investors willing to hold or

acquire our Common Stock, which would negatively impact our ability to access equity markets

and obtain financing, and (ii) impair our ability to provide equity incentives to our employees."

No reference is made to the GEM Agreement in the risk factor.

111.    The availability of financing from GEM was of material importance to the

Company's capital and liquidity and disclosed as such. The Offering Documents contained a

material omission in failing to disclose that there was an imminent and probable risk that the

funds would be unavailable due to a suspension and delisting from the NYSE.

<u>The Misleading Statement Regarding the Use of Proceeds in the Offering Documents</u>

112.    In the section on "Use of Proceeds," the Offering Documents state:

> We estimate that the net proceeds from the sale of
> securities in this offering will be approximately $15.1 million after
> deducting the underwriting discounts and commissions and
> estimated offering expenses payable by us….. Our expected use of
> the net proceeds from this offering represents our current
> intentions based upon our present plans and business condition. As
> of the date of this prospectus, we cannot predict with certainty all
> of the particular uses for the net proceeds to be received upon
> completion of this offering, or the amounts that we will actually
> spend on the uses set forth above. **However, we currently plan to
> use the net proceeds to us from this offering primarily for
> general corporate purposes, including working capital,
> operating expenses and capital expenditures**.

(Emphasis added.)

113.    The description of the use of proceeds contemplates that the Company will

continue as a going concern. It does not contemplate using proceeds from the Offering to fund

bankruptcy proceedings, pay hundreds of thousands of dollars to bankruptcy advisors, or raise

that as a possibility, let alone that the proceeds will be used to fund a fire-sale liquidation.

114.    The delisting of Quanergy's common stock, coupled with the Company's failure to raise capital or find a merger partner through the Raymond James process, made it impossible to raise additional capital.

115.    Young Conaway's and FTI's retentions signal that, as of late September 2022, the prospect of bankruptcy was highly likely. While the Company did disclose that it had implemented and carried out a "restructuring program" in October 2022, the Offering Documents do not disclose the retention of expert bankruptcy advisers. The use of the funds to pay Young Conaway, FTI and other legal professionals for hundreds of thousands of dollars in connection with bankruptcy and liquidation for the work already done in October, is not disclosed as a use of proceeds from the Offering.

116.    By December 13, 2022, FTI had invoiced and been paid over $1 million for two and a half months of work. In the month of November alone, Young Conaway invoiced $550,000. Under the circumstances facing Quanergy, these expenses, and this use of funds, which depended on the Offering proceeds, was foreseeable.

117.    The risk of delisting Section 802.01B for failure to meet the $15 Million Requirement was known or knowable to the Company, as were the implications this had for the Company, making a bankruptcy filing and liquidation likely, and diverting the Offering proceeds to that purpose.

A.    **The Delisting and Bankruptcy**

118.    On November 2, 2022, Quanergy announced the closing of the Offering for gross proceeds of approximately $16.7 million prior to deducting underwriting discounts and commissions and offering expenses.

119.    The market reacted to the news, closing down at $0.88, 10 cents less than the day before.

120.    The stock price never recovered. On November 7, 2022, just three days after the Offering closed, the stock fell to a new low of $0.71, which caused the 30-day average market capitalization to fall below $15 million to $14.9 million.

121.    The next day, November 8, 2022, Quanergy received a letter from the staff of NYSE Regulation notifying the Company that it had determined to commence proceedings to delist the Company's common stock (NYSE:QNGY) and the Company's warrants to purchase common stock (NYSE:QNGY WS) from the NYSE due to failure to comply with the $15 Million Requirement.

122.    In contrast to when Quanergy had failed to comply with the $1 Price Requirement and $50 Million Requirement, developments that had been disclosed as risks in the Offering Documents, a violation of the $15 Million Requirement, which had not been disclosed as a risk, did not allow for a "cure" period. Thus, the NYSE suspended trading in Quanergy's common stock and warrants and delisted them after the market close on the NYSE on November 8, 2022.

123.    The Company's announcement of the delisting at 4:40 p.m. EST stated that "NYSE Regulation reached its decision to delist these securities pursuant to Section 802.01B of the NYSE's Listed Company Manual because the Company had fallen below the NYSE's continued listing standard requiring listed companies to maintain an average global market capitalization over a consecutive 30 trading day period of at least $15,000,000."

124.    This news shocked the market and caused a further drop in the stock price to a new low, $0.24 per share.

125.    In its Form 10-Q filed on November 14, 2022, the Company acknowledged that, due to the delisting, the GEM credit facility was now unavailable: "As a result of the suspension

of trading of our Common Stock on the NYSE, commencing November 8, 2022, we are currently not able to access the GEM facility."

126.    On December 13, 2022, Quanergy filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Company has sought confirmation of a plan and approval of an expedited sale process under which it will seek to sell its assets at auction on January 23, 2022. Under the current record filed with the bankruptcy court, it appears unlikely that equity holders will receive any value in the proceedings.

COUNT I

Against the Individual Defendants
for Violations of Section 11 of the Securities Act

127.    Plaintiffs repeat and reallege every allegation contained above.

128.    This Count is brought by Plaintiffs under Section 11 of the Securities Act, 15 U.S.C. § 77k. For purposes of this Section 11 claim, Plaintiffs are not required to allege that any Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 11 claim. Plaintiffs disclaim any allegations of fraud, scienter, or recklessness.

129.    The Offering Documents contained untrue statements of material fact and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading, as alleged above.

130.    As signatories of the Offering Documents, directors of the issuer, or a person performing similar functions as to a director, the Defendants were responsible for their contents and dissemination.

131.    The Defendants did not act with reasonable care to ensure there were no untrue statements of material fact or omissions to state material facts required to be stated therein or necessary to make the statements therein not misleading in the Offering Documents.

11930101-7

132.     These Defendants issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents. By reasons of the conduct alleged, each of these Defendants violated Section 11 of the Securities Act.

133.     Plaintiffs' purchase of the Units was issued pursuant to, and traceable to the Offering because Plaintiffs purchased the Units directly in the Offering.

134.     Plaintiffs have sustained damages. The value of Quanergy's common stock has declined substantially after and as a result of the alleged violations.

135.     At the times when it purchased the Units, Plaintiffs were without knowledge of the facts concerning the misleading statements and omissions alleged in this Complaint and could not have reasonably discovered those facts before Quanergy's subsequent announcements. Less than one year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time when Plaintiffs filed this Complaint. Less than three years have elapsed from the time when the securities upon which this Count is brought were bona fide offered to the public to the time when Plaintiffs filed this Complaint.

<u>COUNT II</u>

<u>Against the Individual Defendants for Violations of Section 15 of the Securities Act</u>

136.     Plaintiffs repeat and reallege every allegation contained above.

137.     This Count is brought by Plaintiffs under Section 15 of the Securities Act, 15 U.S.C. § 77o. For the purposes of this Section 15 claim, Plaintiffs are not required to allege that any Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 15 claim.

138.    Each of the Individual Defendants was a control person of Quanergy by virtue of his or her position as a director or senior officer of the company, and by reason of his or her own involvement in the daily business of Quanergy. The Individual Defendants, at the time they held positions with Quanergy, were able to, and did, exercise substantial control over Quanergy's operations, including control of the materially untrue and misleading statements, omissions, and course of conduct complained of in this action.

139.    Indeed, Kevin Kennedy, Tianyue Yu and Patrick Archambault were touted in the Offering Documents as "critical to our overall management," the loss of which would impede business operations. Directors Jim DiSanto, Lisa Kelley and Thomas Rohrs sat on the Audit Committee. Director Tamer Hassanein had first sat on the Board of Legacy Quanergy in 2014, and the venture capital firm with which he was affiliated was beneficial owner of 27.1% of the Company's stock at the time of the Merger. Karen Francis' service as a Director began in 2018.

140.    Moreover, each of the Individual Defendants would have been involved in the process led by Raymond James, including approving the retention of Raymond James and its outreach to over 150 possible counterparties. In the normal course of business, when running a strategic process such as that conducted by Raymond James, members of executive management work closely with the financial advisor and all board members receive regular updates at each significant stage.

141.    Each of the Individual Defendants signed the Registration Statement, a necessary step in the Offering.

142.    Each of the Individual Defendants exercised control over the violations of Sections 11 the Securities Act alleged in Count I above, based on having signed the Offering

Documents or having otherwise participated in the process that allowed the Offering to be completed.

143.    The Individual Defendants also controlled Quanergy's acts as seller, within the meaning of Section 12(a)(2) of the Securities Act. Quanergy promoted and sold the Units by means of the defective offering documents for its own financial interests.

144.    The Offering Documents were required pursuant to a public offering and contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as alleged above.

145.    Quanergy successfully solicited the sale of its securities by participating in the preparation and distribution of the untrue and misleading Offering Documents, which included signing the Registration Statement.

146.    Quanergy did not act with reasonable care to ensure there were no untrue statements of material fact or omissions to state material facts required to be stated therein or necessary to make the statements therein not misleading in the Offering Documents. In the exercise of reasonable care, Quanergy would have known of such untruth or omission.

147.    Plaintiffs' purchase of the Units common stock was issued pursuant to, and traceable to the Offering because Plaintiffs purchased their Units directly in the Offering.

148.    By reason of the conduct alleged in this Complaint, Quanergy violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs purchased the Units pursuant to the Offering Documents and sustained substantial damages in connection with its purchases of the Units. Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for their Units.

149.    At the times when they purchased the Units, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before Quanergy's subsequent announcements. Less than three years have elapsed from the time when the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

150.    As a result of the foregoing, Plaintiffs have suffered damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Awarding damages to Plaintiffs for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest on the damages, or, in the alternative, awarding Plaintiffs rescission to the extent they still hold Units, or if sold, awarding recessionary damages in accordance with Section 12(a)(2) of the Securities Act;

B.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

C.    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

11930101-7

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: New York, New York
        January 24, 2023

                                        OLSHAN FROME WOLOSKY LLP


                                        By:   /s/ *Thomas J. Fleming*
                                              Thomas J. Fleming
                                              Adrienne M. Ward
                                              *Attorneys for Plaintiffs*
                                              1325 Avenue of the Americas
                                              New York, New York 10019
                                              (212) 451-2300

11930101-7