**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SABBY VOLATILITY WARRANT
MASTER FUND LTD., et al.,

      Plaintiffs,

vs.

KEVIN J. KENNEDY et al.,

      Defendants.

Case No. 1:23-cv-00601 (JGK)(RFT)

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF JOHN LEVY**</u>

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ..................................................................................................... 1

II.  FACTUAL BACKGROUND .................................................................................... 3

III.  LEGAL STANDARD ............................................................................................... 4

IV.  ARGUMENT ............................................................................................................ 5

     A.  Levy Lacks Education, Training, or Experience Needed to Provide
        Expert Testimony on Regulatory Disclosure Obligations and
        Reasonable investigation in Securities Actions ................................................... 5

     B.  Levy's Opinions Are Unreliable and Fundamentally Flawed ........................... 11

        1.  Levy's Opinions Are Devoid of Analyses ............................................. 12

        2.  Levy's Conclusions Are Premised on the Incorrect
            Standard……………………….. .................................................... 15

     C.  Levy's Opinions Are Unhelpful to a Jury ......................................................... 16

V.  CONCLUSION……………………………………………………………………18

TABLE OF AUTHORITIES

Page(s)

**Cases**

*523 IP LLC v. CureMD.Com*,
　48 F. Supp. 3d 600 (S.D.N.Y. 2014) ............................................................... 12

*Anderson News, L.L.C., v. Am. Media, Inc.*,
　2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015) ................................................. 17

*Boucher v. U.S. Suzuki Motor Corp.*,
　73 F.3d 18 (2d Cir. 1996) ............................................................................... 14

*Bustamante v. KIND, LLC*,
　100 F.4th 419 (2d Cir. 2024) ............................................................................ 4

*Daniels-Feasel v. Forest Pharms., Inc.*,
　2023 WL 4837521 (2d Cir. July 28, 2023) ...................................................... 4

*Daubert v. Merrell Dow Pharms., Inc.*,
　509 U.S. 579 (1993) ............................................................................. 4, 5, 18

*Freedman Normand Friedland LLP v. Cyrulnik*,
　2024 WL 2218748 (S.D.N.Y. May 15, 2024) ........................................ 7, 10, 13

*GeigTech E. Bay LLC v. Lutron Elecs. Co.*,
　2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023) .................................................. 6

*Gen. Elec. Co. v. Joiner*,
　522 U.S. 136 (1997) ........................................................................................ 12

*Hayden v. Int'l Bus. Machines Corp.*,
　2025 WL 1697021 (S.D.N.Y. June 17, 2025) ........................................ 4, 12, 18

*Highland Cap. Mgmt., L.P. v. Schneider*,
　379 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................................... 12, 16

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
　2025 WL 354671 (S.D.N.Y. Jan. 30, 2025) ..................................................... 6

*In re M/V MSC FLAMINIA*,
　2017 WL 3208598 (S.D.N.Y. July 28, 2017) ................................................... 6

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II*,
　982 F.3d 113 (2d Cir. 2020) ......................................................................... 4, 15

TABLE OF AUTHORITIES (cont.)

Page(s)

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007)......................................................................9

*In re Williams Sec. litigation-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) .................................................................................10

*In re WorldCom, Inc. Sec. Litig.*,
  346 F. Supp. 2d 628 (S.D.N.Y. 2004) ........................................................................8

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ..................................................................................................12

*Liberty Mut. Ins. Co. v. Day to Day Imports Inc.*,
  2025 WL 2117897 (S.D.N.Y. July 29, 2025)..............................................................15

*Mancuso v. Consol. Edison Co. of N.Y.*,
  967 F. Supp. 1437 (S.D.N.Y. 1997) ...........................................................................6

*Marvel Worldwide, Inc. v. Kirby*,
  777 F. Supp. 2d 720 (S.D.N.Y. 2011) ........................................................................18

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
  877 F.2d 1333 (7th Cir. 1989) ...................................................................................14

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ...................................................................................5, 17

*Quiles v. Bradford-White Corp.*,
  2012 WL 1355262 (N.D.N.Y. Apr. 18, 2012)............................................................16

*Riegel v. Medtronic, Inc.*,
  451 F.3d 104 (2d Cir. 2006) ......................................................................................12

*SEC v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) .....................................................................5, 17

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) .........................................................................................8

*Torres v. Cnty. of Oakland*,
  758 F.2d 147 (6th Cir. 1985) .....................................................................................16

*U.S. Small Bus. Admin. v. Feinsod*,
  2025 WL 1677409 (E.D.N.Y. June 13, 2025).........................................................6, 7

## TABLE OF AUTHORITIES (cont.)

Page(s)

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ............................................................................ 16

*United States v. Dukagjini*,
   326 F.3d 45 (2d Cir. 2003) ................................................................................... 3

*United States v. Gentile*,
   2024 WL 3455834 (E.D.N.Y. July 17, 2024) .................................................... 15

*United States v. Scop*,
   846 F.2d 135 (2d Cir. 1988) ........................................................................ 16, 17

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004) ................................................................................... 6

*Weisgram v. Marley Co.*,
   528 U.S. 440 (2000) ..................................................................................... 5, 11

**Statutes**

15 U.S.C. § 77k(b)(3) .......................................................................................... 2
15 U.S.C. § 77o ................................................................................................... 2
15 U.S.C. § 78a ................................................................................................. 13
15 U.S.C. §§ 77k(a), 77j ................................................................................... 13
78 U.S.C. §§ 78(j)(b), 78m(a) .......................................................................... 13

## I.    INTRODUCTION

Plaintiffs Sabby Volatility Warrant Master Fund Ltd., SZOP Multistrat LP, Alto Opportunity Master Fund SPC-Segregated Master Portfolio B, and Hudson Bay Master Fund Ltd ("Plaintiffs") proffer John Levy—an accountant with no legal training or experience—to serve as a putative "expert" on Defendants' disclosure obligations and satisfaction with Section 11's "reasonable investigation" defense.  Levy has never been engaged or qualified as an expert in *any* field before being retained in this case.  He is totally unqualified as he has no expertise that pertains to the matters on which he offers opinions.  Levy has never evaluated disclosure issues in public offerings, and admits to being unfamiliar with the fundamental public disclosure regulations and standards governing this action.  If that were not enough to disqualify Plaintiffs' proposed expert, his application of incorrect legal standards, improper credibility assessments, and lack of any supporting analyses are fatal to his opinions.  His opinion does not meet the exacting standards of Rule 702 and should be disregarded.

Plaintiffs purchased common stock and warrants in Quanergy Systems, Inc. ("Quanergy" or "Company") in a public offering on November 2, 2022 ("Offering").  The Complaint asserts claims under Sections 11 and 15 of the Securities Act of 1933 against Quanergy's former officers and directors: Kevin Kennedy, Patrick Archambault, Jim DiSanto, Karen Francis, Tamer Hassanein, Lisa Kelley, Thomas Rohrs, and Tianyue Yu ("Defendants").  Plaintiffs assert that Defendants omitted material information from the Offering Documents regarding risks that Quanergy: (1) would be delisted from the NYSE; (2) would be unable to access needed capital; and (3) would need to use proceeds from the Offering to fund bankruptcy proceedings.  The Defendants are entitled to an affirmative defense to the Section 11 claim that they had "after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the

registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3). A similar defense is available under Section 15.[1]

To disprove Defendants' reasonable investigation defense, Plaintiffs retained John Levy, an armchair expert on the Defendants' disclosure obligations and what constitutes a reasonable investigation regarding disclosure issues in public offering documents. Levy's opinions must be excluded in their entirety.

*First*, Levy lacks the necessary expertise to opine on disclosure obligations or the level of investigation required to satisfy the "reasonable investigation" defense. Levy is an accountant with no legal training or experience. He has never been retained as, testified as, or qualified by any court as an expert witness, let alone in *any* securities case or one involving the specific disclosure-related issues at the heart of this dispute. His opinions are based loosely on his experiences as a CFO in small private companies and one company that engaged in one public offering twenty-five years ago. None of his experiences as an officer or board member involved investigating a public company's likelihood of delisting from a stock exchange. Nor do they involve issues concerning reliance on counsel in any public filing.

*Second*, even if Levy were qualified to provide expert testimony (he is not), Levy's opinions are unreliable. Levy's opinions are premised on the application of state fiduciary law, the incorrect standard for determining whether a director or officer has conducted a reasonable investigation under Section 11 or 15. Furthermore, Levy's opinions are completely devoid of any analyses and should be barred as *ipse dixit* opinions. He relies solely on his experiences as a CFO

---

[1] Section 15 exempts from liability "controlling person[s] [who] had no knowledge of or *reasonable ground to believe* in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o (emphasis added).

and board member but could not explain how such experiences provide a sound basis for his opinions.  Instead, Levy relies on broad conclusions supported by vague references to his "experiences" and hindsight speculation about what a reasonable director or officer would have done.

*Finally*, Levy's improper credibility assessments and narrative testimony are both unhelpful to a jury and inadmissible as expert testimony.

Levy's lack of experience and fundamental misunderstanding of the applicable standards permeate the entirety of his opinions and cannot be salvaged simply by discounting his credibility. Rule 702 and *Daubert* compel this Court to bar Levy's testimony from reaching a jury.  This case is a quintessential example of why courts must be "vigilant gatekeepers of . . . expert testimony." *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003).

## II.     FACTUAL BACKGROUND

Plaintiffs retained Levy to opine whether Defendants' disclosure obligations and whether they conducted a reasonable investigation in connection with Quanergy's October 28, 2022 registration statement ("Registration Statement") and the November 1, 2022  final prospectus ("Prospectus") (together, the "Offering Documents") and whether Defendants reasonably relied on the advice of Company's outside counsel, Cooley, in the preparation of the Offering Documents. Ex. 1 ("Levy Report") ¶ 12.  In sum, Levy opines that Defendants failed to conduct a reasonable investigation to determine whether the alleged misstatements were true and not misleading.  *Id.* ¶¶ 12, 51.  He offers three opinions:  Defendants failed (1) to inform the underwriter of the $15 Million delisting risk, *id.* ¶¶ 23, 31–36; (2) to make "specific inquiries of counsel" regarding disclosing this risk, *id.* ¶¶ 23, 37–47; and (3) to "ask" and "probe" counsel whether to disclose "failed fundraising processes," *id.* ¶¶ 48–50.

But Levy—an accountant—has never before been engaged as an expert witness, Ex. 2, Levy Dep. Tr. 34:3–6, has never testified in *any* securities action, *id.* at 11:20–22, has been involved in only *one* public offering as an officer twenty-five years ago, *id.* at 47:9–19, has never personally experienced issues about disclosing delisting risks, *id.* at 42:18–22, 50:4–16, and admitted he is unfamiliar with the applicable law and defenses, *id.* at 129:9–15. He also lacks the legal training or expertise to offer an opinion regarding investigation standards or the legal requirements of the reasonable investigation defense, or whether the Defendants' conduct satisfied those requirements.

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 702, courts must act as "gatekeep[er]s" of evidence to ensure that "an expert's testimony both rests on a reliable foundation *and* is relevant to the task at hand." *Bustamante v. KIND, LLC*, 100 F.4th 419, 427 (2d Cir. 2024) (emphasis in original) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The court's gatekeeping function requires more than simply "taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note to 2000 amendments. It requires courts to undertake a "*rigorous examination* of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Daniels-Feasel v. Forest Pharms., Inc.*, 2023 WL 4837521, at *3 (2d Cir. July 28, 2023) (emphasis in original) (quoting *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113, 123 (2d Cir. 2020)); *see, e.g.*, *Hayden v. Int'l Bus. Machines Corp.*, 2025 WL 1697021, at *5 (S.D.N.Y. June 17, 2025).

*First*, proposed experts must have appropriate "knowledge, skill, experience, training, or education" in the field in question. Fed. R. Evid. 702. *Second*, if the proposed expert is sufficiently

- 4 -

qualified, the court must determine whether his opinions meet "exacting standards of reliability" required by *Daubert*. *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). In that regard, Rule 702 requires that expert testimony be based on objective criteria and reliable scientific methodology before it can be admitted. *See Daubert*, 509 U.S. at 593; *Nimely v. City of New York*, 414 F.3d 381, 396, 399 (2d Cir. 2005). The proffered testimony must be "properly grounded, well-reasoned, and not speculative." Fed. R. Evid. 702, advisory committee's note to 2000 amendments; *see Daubert*, 509 U.S. at 590 (expert opinion cannot be based on "subjective belief or unsupported speculation"). *Finally*, the testimony must be "helpful to the trier of fact." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

## IV.    ARGUMENT

The Court should exclude Levy's opinions and testimony in their entirety. *First*, Levy lacks the knowledge, skill, experience, training, or education necessary to provide expert testimony on the appropriate level of reasonable investigation or the reasonableness of Defendants' reliance on advice of counsel involved in the preparation and issuance of offering documents. *Second*, Levy's opinions are unreliable. Levy not only fails to articulate the bases for his *ipse dixit* opinions, but applies the incorrect legal standard for assessing the reasonable investigation defense—instead, applying Delaware fiduciary law about the duty of care. Worse still, Levy's conclusions are premised on improper credibility determinations. These issues infect the entirety of Levy's opinions, which must be excluded.

### A.    Levy Lacks Education, Training, or Experience Needed to Provide Expert Testimony on Regulatory Disclosure Obligations and Reasonable investigation in Securities Actions

Levy is not qualified to provide expert testimony on the appropriate level of a reasonable investigation involved in preparing and issuing registration statements or prospectuses, or the reasonableness of a director's reliance on the advice of outside counsel on disclosure obligations.

Other than the present case, Levy has never been retained as an expert. Ex. 2, Levy Dep. Tr. 33:15–17 ("Q: Have you ever been engaged as an expert witness? A: **No.**"), 34:3–6 ("Q: This case . . . was your first expert engagement; correct? A: **Yes**."). He has never been deposed as an expert witness, *id.* at 11:20–22, 33:9–14, nor has he ever been qualified by any court to be an expert witness, let alone in a securities action, *id.* at 34:8–17. At best, the sum of Levy's knowledge can be chalked up to only a layman's understanding of corporate governance and the role of Chief Financial Officer. This is not enough. *See GeigTech E. Bay LLC v. Lutron Elecs. Co.*, 2023 WL 6614486, at *39 (S.D.N.Y. Sept. 20, 2023) (excluding rebuttal expert's opinions where they "amount[ed] to little more than lay criticisms"); *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017) ("[T]he expertise and area of proffered opinions *should be closely related*." (emphasis added)); *U.S. Small Bus. Admin. v. Feinsod*, 2025 WL 1677409, at *16 (E.D.N.Y. June 13, 2025) (disqualifying expert where the court was "left to speculate whether his forty years' experience in the broad 'corporate recovery industry' renders him qualified to offer opinions in the current case").

To determine whether a witness is qualified to provide expert testimony, courts "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). If expert testimony "strays outside the expert's area of qualified expertise," it "must be excluded." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 354671, at *3 (S.D.N.Y. Jan. 30, 2025). The qualification requirement, while broadly construed by courts, "is not a nullity." *Mancuso v. Consol. Edison Co. of N.Y.*, 967 F. Supp. 1437, 1442 (S.D.N.Y. 1997).

None of Levy's formal education, training, or practical experience provides him with the knowledge needed to opine specific issues concerning a reasonable investigation involved in a large public offering.  *Cf. Feinsod*, 2025 WL 1677409, at \*17 ("The issue is not that [the proposed expert] is inexperienced, but it is that he fails to demonstrate how this experience applies to the opinions rendered in this case and how the experience was formative in making his conclusions."). Levy is formally educated and trained as an accountant, Ex. 1, App. A, Levy Report, but here, he does not offer accounting-related or financial expertise.  Instead,  Levy purports to offer his opinion about the adequacy of Defendants' investigation into whether to disclose certain risks in public filings.  Levy Report ¶ 2.

But Levy lacks the legal training or expertise to offer an opinion regarding Defendants' disclosure obligations, the legal requirements of the reasonable investigation defense, or whether the Defendants' conduct satisfied those requirements based on industry standards and practices. *See* Ex. 2, Levy Dep. Tr. 46:4–47:3; *see cf. Freedman Normand Friedland LLP v. Cyrulnik*, 2024 WL 2218748, at \*2 (S.D.N.Y. May 15, 2024) (Koeltl, J.) (excluding a valuation expert who "lack[ed] any legal training and has never placed a valuation on a lawsuit").  Indeed, he openly admits he is unfamiliar with Section 11, the applicable regulatory disclosure requirements, the "duty to disclose," and the reasonable investigation defense. Ex. 2, Levy Dep. Tr. 129:9–15 ("**No, I'm not familiar with Section 11**."), *id.* at 53:19–54:2; *id.* at 78:16–24 ("Q: Have you ever heard of the term 'duty to disclose' in the context of whether an issuer is required to disclose information in its SEC filings?  A: Apart from whether or not it affects the business judgment rule?  Q: Yes. A: **No, that's not something I'm familiar with.**"); *see also id.* at 151:5–14 ("**What the law was under certain situations was not really relevant to me**."); *id.* at 146:20–147:4 ("Q: You

understand that Section 11 applies to misstatements in registration statements?  A: I'm not—**I don't know the section specifically** . . . .") (emphasis added).

Levy lacks even basic comprehension of disclosing obligations for public companies. When asked whether he knew whether Regulations S-K or S-X applied to disclosure obligations in offering documents, like registration statements or prospectuses, Levy replied, "I don't.  I don't know.  I don't remember."  Ex. 2, Levy Dep. Tr. 53:19–23; *id.* at 52:21–25 ("Q: Have you ever heard of Reg S-K?  A: Yes.  **Q: What's Reg S-K?  A: You know, I don't recall specifically**." (emphasis added)).  But knowledge of these regulations is essential to any opinion concerning disclosure issues.  *See generally In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004) (explaining Regulations S-X and S-K as bedrock regulations for public disclosures in registration statements); *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 104 (2d Cir. 2015)  (describing such regulations as "essential part[s]" under which disclosures are made), *abrogated by Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024).

When asked to explain his understanding of a director or officer's obligations involved in issuing offering statements, Levy could only describe, without precision, "broad" rules about materiality, the duty of care, or the business judgment rule.  *See* Ex. 2, Levy Dep. Tr.45:16–25 ("Q: Do you know if there are any rules which apply to disclosure obligations in SEC filings?  A: Yes . . . [t]hey're relatively broad in that the **company needs to disclose anything that would impact the judgment of a reader** as to the financial condition and the prospects of the company.") (emphasis added); *id.* at 126:23–127:15 ("Q: . . . [D]o [members of management] have different obligations … than outside directors do?  A: . . . They're going to do more work.  Q: Who . . . ? A: Management.  . . . **[B]ut the ultimate determination of whether or not they've exercised the duty of care is the same.**  It's just management is going to have more information.  They're going

to do more work.  They're going to communicate to the board. So in that respect … **they have a different level of care of the duty**." (emphasis added)); *id.* at 77:6–78:24 (analogizing public disclosure requirements to the business judgment rule); *id.* at 44:22-45:11 ("The duty of care means they have to exercise due diligence.  They have to be careful, cautious in that they cannot be grossly negligent in their actions").

At best, Levy has only a cursory understanding of general corporate governance.   He has taught only one general "corporate governance course" involving the business judgment rule, duty of loyalty, and duty of care.  *Id.* at 44:5–14.  He has no experience giving lectures, seminars, or any course involving disclosure obligations under SEC regulations.  *Id.* at 45:12–15.  None of Levy's publications are peer-reviewed or academic publications but rather appear to be trade articles, practical guides, or practical reference books.  Ex. 1, App. B, Levy Report.  Even the most relevant publications address only general matters of corporate governance.  *Id.* ("How to make a Director Great Again," "Effective Corporate Governance," and "When a crisis hits, the arduous work of special investigation committees can pay great dividends for a company's future").

Even with Levy's general knowledge of a director and officer's fiduciary duties, Levy could not even clearly articulate the standard for materiality.  Ex. 2, Levy Dep. Tr. 63:13–16 ("Q: Do you know if there is a legal test for materiality?  A: I believe that's—**I don't know**. I don't know if they are specifically legal."); *id.* at 72:3–73:17 (broadly defining materiality as "**what would an investor want to know**? What would a shareholder want to know?") (emphasis added).

But Levy's "general" knowledge about fiduciary duties is insufficient where he lacks "the industry-specific expertise necessary to make the numerous judgments" in his analysis. *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1245 (N.D. Okla. 2007) ("But regardless of the mix of formal credentials and experience that is proffered as establishing the requisite "qualifications"

under [Rule 702], **those qualifications must be *specific*** as well as *general*." (emphasis added and emphasis in original)), *aff'd sub nom. In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009); *see Freedman Normand Friedland*, 2024 WL 2218748, at *2 (disqualifying an accountant from opining on valuations despite his "extensive credentials in finance, accounting, and the valuation of companies").

Nor does Levy's experience as a board member or CFO qualify him to testify as an expert witness. *See* Ex. 1, App. A, Levy Report. In total, Levy has been involved in only *two* public offerings as a director or officer: one as an officer *twenty-five years* ago, Ex. 2, Levy Depo Tr. 48:8–15 ("Q: So would it be accurate to say that other than your experience as a director, I'm talking about your employment experience, that you've been involved in **one public offering**? A: **Yes**. Q: Okay. And you were involved in your capacity as an officer? A: Yes."), 47:13–23 ("Q: . . . Did MediaBay do any public offerings while you were there? . . . A: **I want to say just one**. . . . [in] March of 2000. Q: So **25 years ago**? A: **Yes**."), and one as a director *more than fifteen years* ago, which was a public debt offering—not an offering of shares, *id.* at 49:5–19 ("Q: Can you tell me whether any of these companies did any public offerings while you were on the board? . . . A: Take-Two did a public debt offering I believe. … I believe **that's the only one that actually did a public offering while I was on the board**. Q: . . . Do you remember when the public offering was? A: I want to say 2009."); *id.* at 51:17–25 (" . . . A: I think [the Take-Two offering] was a public debt offering. … Q: So it wasn't offering of shares? A: **No**.") (emphasis added).

Critically, Levy could not recall whether any of his experiences as a director or officer on public companies involved *any* risk disclosure issues or other issues involving reliance on outside counsel that are at the heart of this dispute. For instance, Levy claims that "[b]ased on [his]

experience," Defendants failed to adequately investigate whether to disclose the risk of delisting pursuant to the $15 Million Requirement.  Ex. 1, Levy Report ¶ 23.  Yet Levy could not recall a single instance in which any public company he was involved in made *any* delisting risk disclosures in their own SEC filings.  Ex. 2, Levy Dep. 42:18–22 ("Q: Do you recall whether MediaBay made any disclosures in their SEC filings prior to the time they were delisted concerning the risk of delisting?  A: **No**.").  Similarly, Levy claims Defendants failed to make "specific inquiries" or "probe" outside counsel regarding certain disclosure issues, Ex. 1, Levy Report ¶¶ 23, 37–47, 49–50, but he could not recall whether he consulted with outside counsel *on any disclosure issues* at the time he was CFO of the public company, Ex. 2, Levy Dep. Tr. 50:4–16 ("Do you remember whether you consulted with outside counsel on any disclosure issues?  A: **I'm sure we did, but I don't recall specifically**.") (emphasis added).

Finally, Levy even admits his opinions are *not* based on the reasonable investigation defense under Section 11, leaving Defendants to wonder what, if any, contributions Levy's opinions offer in this case.  Ex. 2,  Levy Dep. Tr. 152:15–19 ("Q: Okay. So . . . [your] opinion is not based upon your evaluation of the reasonable investigation defense under Section 11; correct?  A **Yes**.");  *see also id.* at 126:4–128:25 (citing duty of care to determine whether a director or officer conducted a "reasonable investigation").  Because Levy is not qualified to render opinions on disclosure obligations in securities filings and the reliance of counsel, all of Levy's opinions should be excluded.

### B.    Levy's Opinions Are Unreliable and Fundamentally Flawed

Setting aside Levy's lack of qualifications, his methodologies fall far short of the "exacting standards of reliability" required by *Daubert* and Rule 702.  *See Weisgram*, 528 U.S. at 455.  Rule 702 "imposes a special obligation upon a trial judge" to ensure that all expert testimony is "not

only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Relevant

expert opinion testimony is admissible only if "the testimony is the product of reliable principles

and methods" and "the expert's opinion reflects a reliable application of the principles and methods

reliably to the facts of the case."  Fed. R. Evid. 702 (c), (d).  Where a witness relies solely or

primarily on his experience, the witness "must explain **how** that experience leads to the conclusion

reached, **why** that experience [provides] a sufficient basis for the opinion, and **how** that experience

is reliably applied to the facts."  *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y.

2014) (emphasis added); *e.g.*, *Hayden*, 2025 WL 1697021, at *6.  If there is "simply too great an

analytical gap between the data and the opinion proffered," the court should exclude the proposed

expert testimony.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### 1.    Levy's Opinions Are Devoid of Analyses

Levy relies solely on his experience as a director or officer for his opinions, but he

systematically fails to explain "how" he came to each of his conclusions or "what methodologies

or evidence" substantiate his conclusions.  *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir.

2006) *aff'd*, 552 U.S. 312 (2008).  Levy vaguely cites his "experiences" without attempting to

identify *which* experiences, in *which* roles, or explain *how*, or *why* such experiences provide a

reasonable basis for his conclusions.  Ex. 1, Levy Report ¶¶ 33, 44, 48, 50 ("Based on my

experience . . . "); *id.* ¶¶ 36, 44 ("In my experience . . . "); *id.* ¶ 36 ("In my experiences as a chief

financial officer, consultant and board member . . . ");  Ex. 2, Levy Dep. Tr. 152:3–14 ("I'm

offering that opinion [an opinion in the context of the reasonable investigation defense in Section

11] after my years as a CFO and as a director").  The "failure to show his work is fatal," and the

Court should exclude his opinions as *ipse dixit* conclusions.  *Hayden*, 2025 WL 1697021, at *6;

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 473 n.2 (S.D.N.Y. 2005) ("[A]n

expert basing his opinion solely on experience 'must do more than aver conclusorily that his experience led to his opinion . . . .'"); *see, e.g.*, *Freedman Normand Friedland*, 2024 WL 2218748, at *3.

Despite having claimed he has "many years of conducting due diligence," Ex. 1, Levy Report ¶ 51, he could not articulate specific examples, instead offering only perfunctory instances of "being on calls," "talk[ing]" to lawyers, board, and management, or "preparing public documents" like 10-Ks or 10-Qs. *See* Ex. 2, Levy Dep. Tr. 51:1–11 ("Q: Do you remember as an independent director consulting with outside counsel? . . . A: I remember being on calls with both . . . inside counsel and outside counsel[.]"); *id.* at 73:18–74:4 ("Q: "During the time that you served in public companies, do you sometimes have questions about whether information was required to be disclosed in public documents?  A: Yes. . . . I would talk to our auditors. I would talk to our lawyers, and I would also talk to the board, and I would talk to management"); *id.* at 144:17–145:4 ("A: I've got . . . 30–31 years of preparing public documents, 10-Ks, 10-Qs also disclose risk.").  Such nondescript accounts of his "experience" do not come close to the comprehensive process involved in preparing prospectuses and registration statements needed in public offerings, which unlike annual or quarter reports, have different disclosure requirements. *Compare* 15 U.S.C. §§ 77k(a), 77j, *with* 15 U.S.C. § 78a *et seq.*

Moreover, whatever experience Levy may have in preparing certain SEC filings (*i.e.*, 10-Ks and 10-Qs) is irrelevant to his opinion regarding the reasonable investigation defense.  This is because the "reasonable investigation" defense is unique to Section 11 and 12(a)(2) claims and does not apply to claims for misstatements in SEC periodic filings.  *See* 78 U.S.C. §§ 78(j)(b), 78m(a).  Indeed, Levy concedes he does not know whether the reasonable investigation defense applies to annual reports or quarterly reports.  Ex. 2, Levy Dep. Tr. at 149:11–150:4 ("Q: Do you

know if the reasonable investigation defense that sets forth in Section 11 applies to misstatements in 10-Ks and 10-Qs?  A: **I don't know.**  Q: . . . So the standards for whether or not a signer of a registration statement conducted a reasonable investigation, you don't know whether those standards apply to disclosures in Section—in a 10-K or a 10-Q; right?  A: **No, I don't know.**") (emphasis added).

Levy routinely offers only sweeping conclusions untethered to any supporting analyses, leaving Defendants and this Court to speculate how he came to his conclusions.  Levy's "speculative or conjectural" "testimony should be excluded." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996).  For instance, Levy criticizes Defendants for failing to "probe" or "press the issue" of delisting risks with Cooley or "ask the questions that in [his] experience a reasonable officer or director would ask."  Ex. 1, Levy Report ¶¶ 44, 47.  But he never explains what these questions should have been or what a reasonable director or officer should have done instead.  *See id.* ¶¶ 47–50; *see, e.g.*, Ex. 2, Levy Dep. Tr. 158:6–160:18; *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1339 (7th Cir. 1989) (holding expert testimony was properly excluded where the expert "presented nothing but conclusions—no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected").  When asked *why* a reasonable director would need to further "probe" counsel if all directors agreed with counsel's advice, Levy could not offer any explanation; he merely asserts that reasonable directors "should not agree."  Ex. 2, Levy Dep. Tr. 160:5–18 ("Q: … [L]et's assume the presentation is made by the counsel.  A: Yes.  Q: The presentation I described, and every director says, Based upon everything I know, I agree with you.  Do they then need to ask the question, Are you sure?  . . . A: If everybody agrees, there is no reason to go forward, **but people shouldn't agree.**") (emphasis added).

- 14 -

Levy mused that he found it "troubling" that the Offering Documents contained "a number of . . . 'boilerplate risks,'" but never explains why such disclosures were "troubling" or even relevant.  Ex. 1, Levy Report ¶ 45; *see also* Ex. 2, Levy Dep. Tr. 206:2–12 (concluding without explaining that the company's Section 802:01B reference was "not adequate disclosure"); *see United States v. Gentile*, 2024 WL 3455834, at *4 (E.D.N.Y. July 17, 2024) (excluding expert testimony as unreliable where the expert failed to explain the relevance of the placement of certain disclosures).  Also, when asked to identify a specific instance in which he has seen a company disclose "largely unsuccessful" fundraising efforts, Levy speculated he "might have" and then also conceded such disclosure "would be very rare."  Ex. 2, Levy Dep. Tr. 214:23–215:16.  None of Levy's conclusion are tied to any personal experiences or observations but rather rest on "speculative leaps" that render his opinions unreliable.  *See Mirena II*, 982 F.3d at 123; *see also Liberty Mut. Ins. Co. v. Day to Day Imports Inc.*, 2025 WL 2117897, at *6 (S.D.N.Y. July 29, 2025) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, . . . [are] grounds for rejection of expert testimony.").

### 2.    Levy's Conclusions Are Premised on the Incorrect Standard

Additionally, Levy's opinions are fundamentally flawed because he relied on state fiduciary duty obligations which are not only inapplicable, Ex. 2, Levy Dep. Tr. 126:4–127:22, 147:15–23, 127:16–22, but also for which he has no expertise, *see supra* Section II.A.  When asked to clarify his understanding of what constitutes a "reasonable investigation," Levy incorrectly relied on the duty of care.  *See* Ex. 2, Levy Depo Tr. 126:4–127:22 (confirming he applied the "reasonable investigation" standard but then explaining that the "ultimate determination of whether or not they've exercised the duty of care is the same"), 147:15–23 (testifying the "reasonable investigation" standard "**[s]ounds a lot like duty of care, but it's not quite the same**

**thing**"), 127:16–22 ("Q: Duty of care is a Delaware corporate concept; right?  A: **Yes.**  Q: It applies to whether or not directors satisfy their fiduciary obligations; correct?  A: **Yes.**") (emphasis added).

Of course, while Levy may not offer legal opinions, Levy's unfamiliarity with key concepts at issue—like the standard used to determine whether a director or officer performed a reasonable investigation—vitiates his opinion that "Defendants did not conduct adequate due diligence, and did not conduct a reasonable investigation."  Ex. 1, Levy Report ¶ 51; *see United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988) (recognizing the risk of danger in conveying a witness's "unexpressed, and perhaps erroneous, legal standards to the jury" (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985))).  Indeed, Levy offered no testimony to describe industry practices or customs based on *his personal* experience to support his interpretation of what constitutes a "reasonable investigation."  *See Highland Cap.*, 379 F. Supp. 2d at 471 (excluding an expert's testimony about securities laws where the expert failed to offer "testimony concerning 'terms and materials' relevant to the securities industry—except for his discussion of securities law terms that could easy be explained by a judge to a jury"); *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice.").

## C.    Levy's Opinions Are Unhelpful to a Jury

Finally, Levy's opinions that Defendants "failed to ask questions about the $15 Million Requirements and the Offering Documents" Ex. 1, Levy Report ¶¶ 47, 23, 37–50, "simply rehash[]" Quanergy's former CFO's testimony and emails of which "he has no personal knowledge" and "parrot[s]" Plaintiffs' arguments that Defendants failed to conduct a reasonable investigation.  *Highland Cap.*, 379 F. Supp. 2d at 469; *Quiles v. Bradford-White Corp.*, 2012 WL

1355262, at *7 (N.D.N.Y. Apr. 18, 2012); *Anderson News, L.L.C., v. Am. Media, Inc.*, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018). Levy's opinions that Defendants failed to make "specific inquiries of counsel" regarding disclosing delisting risks and Quanergy's outreach efforts, Ex. 1, Levy Report ¶¶ 23, 37–50, are based on his interpretation of Quanergy's former CFO Pat Archambault's testimony and emails regarding whether Defendants asked Cooley about disclosing the delisting risk. *Id.* ¶¶ 30, 42 (quoting Mr. Archambault's testimony); Ex. 2, Levy Dep. Tr. 140:2–18 (interpreting Mr. Archambault's intent), 161:8–162:11 ("I quoted [Mr. Archambault's testimony in my report] [where] . . . **he said the question was asked and answered**. **There is nothing to support that in the documents**.") (emphasis added). But a jury does not need expert testimony to understand whether Defendants, in fact, asked questions of counsel about whether to include certain risks. Levy's testimony is merely a "a vehicle for factual narrative" and should be excluded. *Tourre*, 950 F. Supp. 2d at 675.

Levy's improper credibility assessments are an independent reason to exclude his opinions. *See Nimely*, 414 F.3d at 398 (impermissible expert's testimony "went at least one step further, in that it commented directly, under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses"); *Scop*, 846 F.2d at 142 ("[E]xpert witnesses may not offer opinions on relevant events based on their personal assessment of the credibility of another witness's testimony."); *Tourre*, 950 F. Supp. 2d at 675 (expert testimony may not "usurp the province of the judge to instruct on the law, or of the jury to make factual determinations"). Here, Levy questions Mr. Archambault's accounts that Defendants discussed disclosure risks with counsel in support of Levy's conclusion that Defendants "did not ask the questions that in [his] experience a reasonable officer or director would ask." Ex. 1, Levy Report ¶ 47; Ex. 2, Levy Depo. Tr. 167:7–11 (stating Mr. Archambault's testimony that directors asked counsel and counsel agreed "**conflicts with his**

**other testimony**"); *id.* at 169:6–170:4 ("If [Mr. Archambault] remembered the testimony, he sort of said, I remember having this discussion. **He doesn't say that.** He says, 'Generally, we talked about this, and then came to a conclusion**. To me, the more important fact is that he doesn't recall having this conversation.**") (emphasis added). Such testimony "directs the trier of fact to believe one account of events over another . . . [,] undertakes to tell the jury what result to reach and attempts to substitute the expert's judgment for the jury's[,]" and must be excluded. *Hayden*, 2025 WL 1697021, at *9 (quoting *Marvel Worldwide, Inc. v. Kirby*, 777 F. Supp. 2d 720, 730 (S.D.N.Y. 2011)).

In sum, Levy's opinions are not merely "shaky," *Daubert*, 509 U.S. at 596, they are rudimentary conclusions significantly corrupted from flawed assumptions and a dearth of applicable experience.

## V.    CONCLUSION

The Court should exclude Levy's opinions in their entirety under Rule 702.

DATED: August 12, 2025

Respectfully submitted,

*/s/ Thomas Zaccaro*
Thomas Zaccaro (*admitted pro hac vice*)
**HUESTON HENNIGAN, LLP**
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: 213.788.4039
tzaccaro@hueston.com

*Attorney for Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this memorandum of law contains 5,790 words, excluding the caption, table of contents, table of authorities, and signature block. I further certify that this memorandum complies with the formatting rules set forth in Judge Koeltl's Individual Practices, including the requirements relating to margins, font size, and line spacing.

DATED: August 12, 2025

/s/ *Thomas Zaccaro*

Thomas Zaccaro *(admitted pro hac vice)*
**HUESTON HENNIGAN, LLP**
523 West 6th St, Suite 400
Los Angeles, CA 90014
Telephone: 213.788.4039
tzaccaro@hueston.com
*Attorney for Defendants*

- 20 -