UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SABBY VOLATILITY WARRANT MASTER FUND LTD. et al.,<br><br>                   Plaintiff,<br><br>    -against-<br><br>KEVIN J. KENNEDY et al.,<br><br>                 Defendants. | 23-CV-00601 (JGK) (RFT)<br><br><br>**<u>OPINION & ORDER</u>** |

**ROBYN F. TARNOFSKY, United States Magistrate Judge:**

Plaintiffs Sabby Volatility Warrant Master Fund Ltd. ("Sabby"), SZOP Multistrat LP ("SZOP"), Alto Opportunity Master Fund SPC Segregated Master Portfolio B ("Alto"), and Hudson Bay Master Fund Ltd. ("Hudson Bay"), purchasers of common stock of Quanergy Systems, Inc. ("Quanergy") in a public offering that closed on November 2, 2022 (the "Offering"), bring suit against Defendants Kevin J. Kennedy, Patrick Archambault, Jim Disanto, Karen Francis, Tamer Hassanein, Lisa Kelley, Thomas M. Rohrs, and Tianyue Yu, all former officers and/or directors of Quanergy, for alleged violations Sections 11 and 15 of the Securities Act of 1933, for failing to take reasonable care that there were no material misrepresentations or omissions in the registration statement and prospectus for the Offering (the "Offering Documents"). (*See* ECF 1, Compl. ¶¶ 1-2, 30-34, 131-32.)

Defendants filed a motion for summary judgment (ECF 128), arguing, among other positions, that judgment should be granted in their favor based on the reasonable investigation affirmative defense, often called the due diligence defense. (*See generally* ECF 135, Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' SJ Mem.") (redacted version of ECF 129).) The summary judgment motion is fully briefed and will be decided by the Honorable John G. Koeltl; in support of that motion, Defendants submit expert testimony from Norman J. Harrison, who opines that it was

"customary and appropriate" for Defendants to rely on outside counsel's advice "in discharging their . . . obligations to conduct a reasonable investigation" for purposes of "develop[ing] a reasonable ground" to conclude that the statements in the Offering Documents were true and not misleading. (ECF 159-1, Expert Report of Norman J. Harrison ("Harrison Report") ¶¶ 45, 61.) Plaintiffs support their opposition to Defendants' summary judgment motion with the expert report of John Levy, who rebuts Harrison's opinions. (*See* ECF 144-58, Report of John Levy ("Levy Report")).)

Pending before the Court is Defendants' Motion To Disqualify Levy from providing opinions in this matter ("Motion To Disqualify") (ECF 153). For the reasons set forth below, Defendants' Motion To Disqualify is GRANTED IN PART, in that Levy may not opine (1) on the disputed factual issue whether Defendants asked certain questions of their outside advisors about the need to disclose particular risks in the Offering Documents, or (2) on the credibility of any fact witnesses; the Motion To Disqualify is otherwise DENIED.[1]

### FACTUAL BACKGROUND

This factual background is taken from the admissible materials submitted by the parties; the facts set out below are either undisputed or presented "in the light most favorable to the . . . non-moving party." *In re AXA Equitable Life Ins. Co. COI Litig.,* 595 F. Supp. 3d 196, 209-10 (S.D.N.Y. 2022), *reconsidered in unrelated part*, No. 16-CV-0740 (JMF), 2022 WL 3018104 (S.D.N.Y. July 29, 2022).

---

[1]    "Because *Daubert* motions are nondispositive of the litigation, they are routinely determined by magistrate judges, subject to clear error review by the district judge." *Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 743 F. Supp. 3d 530, 533 (S.D.N.Y. 2024).

In February 2022, Quanergy, a company that provided three-dimensional software solutions, among other products and services, became a public company listed on the New York Stock Exchange ("NYSE"). (*See* ECF 137, Defs.' Rule 56.1 Statement of Undisputed Material Facts ("Defs.' SUMF") (redacted version of ECF 131) ¶¶ 1-2.) In March 2022, NYSE sent Quanergy a letter describing the applicable listing standards. (*See* ECF 143, Pls.' Counterstatement of Additional Material Facts ("Pls.' CSAMF") ¶ 5; ECF 151, Defs.' Response to Pls.' Counterstatement of Additional Material Facts ("Defs.' RCSAMF") (redacted version of ECF 150) ¶ 5.) To remain listed on NYSE, Quanergy was obligated, among other requirements, to maintain an average closing price of $1.00 per share over a 30-trading day period (the "Minimum Share Price Requirement"); maintain market capitalization of $50 million over a 30-trading day period (the "$50 Million Capitalization Requirement"); and maintain a minimum market capitalization of $15 million over a 30-trading day period (the "$15 Million Capitalization Requirement"). (*See* ECF 143, Pls.' CSAMF ¶ 5; ECF 151, Defs.' RCSAMF ¶ 5.) A company may cure failure to comply with the Minimum Share Price Requirement and the $50 Million Capitalization Requirement within specified cure periods; however, there is no cure period for failing to comply with the $15 Million Capitalization Requirement, which leads to immediate suspension of trading and delisting. (*See* ECF 143, Pls.' CSAMF ¶¶ 6, 7, 19; ECF 151, Defs.' RCSAMF ¶¶ 6, 7, 19.)

In June 2022, Quanergy announced that it had received a delisting notice for failing to comply with the Minimum Share Price Requirement; in July 2022, the company announced that it had received a delisting notice for failure to comply with the $50 Million Capitalization Requirement. (*See* ECF 143, Pls.' CSAMF ¶¶ 6, 7; ECF 151, Defs.' RCSAMF ¶¶ 6, 7.) In June 2022, Quanergy began exploring possible financing options, including a debt financing and a merger or

3

sale. (*See* ECF 137, Defs.' SUMF ¶ 7; ECF 143, Pls.' CSAMF ¶¶ 10-11, 13; ECF 151, Defs.' RCSAMF ¶¶ 10-11, 13.) In late August 2022, Quanergy retained an investment bank, Maxim Group LLC ("Maxim"), to explore a public offering. (*See id.* ECF 137, Defs.' SUMF ¶ 13.) Quanergy's primary outside counsel, the Cooley LLP law firm ("Cooley"), was "deeply involved in Quanergy's Offering process." (*Id.* ¶ 19.)

On October 6, 2022, Quanergy announced that it had initiated a reverse stock split in order to increase its share price to comply with the Minimum Share Price Requirement. (*See* ECF 143, Pls.' CSAMF ¶ 8; ECF 151, Defs.' RCSAMF ¶ 8.) By the start of trading on October 12, 2022, Quanergy's market capitalization had fallen below $15 million. (*See* ECF 151, Defs.' RCSAMF ¶ 20.) The next day, Quanergy announced that it had initiated efforts to preserve its capital resources, including a restructuring plan and layoffs. (*See* ECF 143, Pls.' CSAMF ¶ 9; ECF 151, Defs.' RCSAMF ¶ 9.)

On October 18, 2022, after Quanergy's market capitalization declined to approximately $9 million, Defendant Archambault received an email from NYSE indicating that Quanergy risked immediate suspension and delisting due to noncompliance with the $15 Million Capitalization Requirement. (*See* ECF 143, Pls.' CSAMF ¶ 21; ECF 151, Defs.' RCSAMF ¶ 21.) Jerry Allison, then the General Counsel of Quanergy, and outside counsel were copied on the email. (*See* ECF 143, Pls.' CSAMF ¶ 22; ECF 151, Defs.' RCSAMF ¶ 22.)

On October 26, 2022, Defendant Archambault distributed a spreadsheet that described six potential Offering scenarios, four of which resulted in Quanergy's market capitalization dropping below $15 million. (*See* ECF 143, Pls.' CSAMF ¶¶ 23-24; ECF 151, Defs.' RCSAMF ¶¶ 23-24.) The parties dispute whether Archambault shared the substance of the spreadsheet with Quanergy's

full Board of Directors: Plaintiffs say there is no evidence that he did. (*See* ECF 143, Pls.' CSAMF ¶¶ 23, 25; ECF 151, Defs.' RCSAMF ¶¶ 23, 25.)

On October 28, 2022, Defendants Archambault and Kennedy participated in a bringdown due diligence call with the Maxim bankers, who asked Quanergy to provide "any material updates since September 9, 2022, including any material issues or changes" and any "[d]iscussions with any regulatory authorities." (ECF 143, Pls.' CSAMF ¶ 26; ECF 151, Defs.' RCSAMF ¶ 26.) The parties dispute whether anyone informed Maxim of NYSE's October 18, 2022 notice concerning the $15 Million Capitalization Requirement: Plaintiffs say that no one shared that information with Maxim. (*See* ECF 143, Pls.' CSAMF ¶ 26; ECF 151, Defs.' RCSAMF ¶ 26.)

On October 30, 2022, Quanergy announced the Offering at a price of $1.70 per unit consisting of one share of common stock and two warrants. (*See* ECF 143, Pls.' CSAMF ¶ 32; ECF 151, Defs.' RCSAMF ¶ 32.) The Offering Documents contained a section with the caption, "There can be no assurance that we will be able to comply with the continued listing standards of NYSE," and another section with the caption, "Our failure to meet the continued listing requirements of NYSE could result in delisting of our securities." (ECF 143, Pls.' CSAMF ¶ 34; ECF 151, Defs.' RCSAMF ¶ 34.) The sections below these captions discussed issues arising out of a failure to comply with the Minimum Share Price Requirement and the $50 Million Capitalization Requirement but omitted any reference to the risk of noncompliance with the $15 Million Capitalization Requirement, including Quanergy's notification by NYSE on October 18, 2022 that Quanergy risked "immediate suspension and delisting" due to noncompliance with that requirement. (ECF 143, Pls.' CSAMF ¶¶ 34, 36; ECF 151, Defs.' RCSAMF ¶¶ 34, 36.)

On November 8, 2022, Quanergy's common stock closed at $0.71, causing the Company's 30-trading day average market capitalization to decline to $14.9 million, which made Quanergy noncompliant with the $15 Million Capitalization Requirement. (*See* ECF 143, Pls.' CSAMF ¶¶ 46-47; ECF 151, Defs.' RCSAMF ¶¶ 46-47.) NYSE "immediately suspended trading and delisted Quanergy's stock after the market close." (*See* ECF 143, Pls.' CSAMF ¶ 47; ECF 151, Defs.' RCSAMF ¶ 47.) Quanergy's stock price fell to $0.24 per share. (*See* ECF 143, Pls.' CSAMF ¶ 53; ECF 151, Defs.' RCSAMF ¶ 53.) On December 13, 2022, Quanergy filed for bankruptcy. (*See* ECF 143, Pls.' CSAMF ¶ 53; ECF 151, Defs.' RCSAMF ¶ 53.)

## **PROCEDURAL HISTORY**

Plaintiffs filed their complaint (the "Complaint") on January 24, 2023, alleging that Defendants, who are former officers and/or directors of Quanergy and who signed the Offering Documents, violated Sections 11 and 15 of the Securities Act of 1933 by failing to act with reasonable care in determining that there were no material misrepresentations or omissions in the Offering Documents. (*See generally* ECF 1, Compl.) On May 17, 2023, Defendants filed a motion to dismiss (ECF 53), which Plaintiffs opposed (ECF 57), and which Judge Koeltl denied on December 13, 2023. (*See* ECF 67, Order.)

On January 10, 2024, Defendants answered the Complaint, raising a due diligence affirmative defense (*see* ECF 75, Answer at 20), which shields officers and directors from individual liability under Section 11 when, "after reasonable investigation," they:

had reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and

that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3).[2]

By order of reference dated May 22, 2024, Judge Koeltl referred this case to a magistrate judge for general pretrial supervision. (*See* ECF 79, Order of Ref.) The referral was reassigned to me.

Defendants' summary judgment motion (ECF 128) and supporting papers were filed on June 6, 2025. (*See* ECF 135, Defs.' SJ Mem.; ECF 137, Defs.' SUMF; ECF 130, Decl. of Thomas Zaccaro in Supp. of Defs.' SJ Mot. (attaching exhibits, four of which were filed under seal).)[3] On July 18, 2025, Plaintiffs filed their opposition. (*See* ECF 141, Pls.' Mem. of Law in Opp. to Defendants' Summ. J. Mot. ("Pls.' SJ Opp."); ECF 142, Pls.' Response to Defs.' SUMF; ECF 143, Pls.' CSAMF; ECF 144, Decl. of Tamar Prince in Opp. to SJ Mot. (attaching exhibits).)

On August 12, 2025, Defendants filed a reply in further support of their summary judgment motion as well as their Motion To Disqualify Levy. (*See* ECF 149, Defs.' Reply Mem. of Law in Sup. of Defs.' Summ. J. Mot. ("Defs.' SJ Reply"); ECF 151, Defs.' RCSAMF; ECF 152, Decl. of Arianna Demas (attaching exhibits); ECF 153, Defs.' Mot. To Disqualify; ECF 154, Defs.' Mem. in Supp. of Mot. To Disqualify ("Defs.' Levy Mem."); ECF 155, Decl. of Thomas Zaccaro in Supp. of Mot. To Disqualify (attaching exhibits).)

---

[2]    Defendants argue that there is a similar affirmative defense for the Section 15 claim, which exempts from liability "controlling person[s] [who] had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." (ECF 135, Defs.' SJ Mem. at 6 n.2 (quoting 15 U.S.C. § 77o).)

[3]    On June 17, 2025, Defendants filed redacted versions of the sealed exhibits. (*See* ECF 136, Second Decl. of Thomas Zaccaro (attaching redacted versions of four exhibits).)

On September 12, 2025, Plaintiffs filed their opposition to the Motion To Disqualify. (*See* ECF 158, Pls.' Mem. in Opp. to Mot. To Disqualify ("Pls.' Levy Opp."); ECF 159, Decl. of Tamar Prince in Opp. to Mot. To Disqualify (attaching exhibits).) On September 26, 2025, Defendants filed their reply in further support of the motion to disqualify. (*See* ECF 160, Defs.' Reply Mem. in Further Supp. of Mot. To Disqualify ("Defs.' Levy Reply").)

On September 26, 2025, Defendants requested oral argument on the Motion To Disqualify (ECF 161), which request I granted (ECF 162). On October 10, 2025, I ordered Defendants to make a supplemental submission of the full transcript of Levy's deposition. (*See* ECF 163, Order.) Defendants duly filed the full transcript (ECF 164-1). On November 4, 2025, I heard oral argument on the Motion To Disqualify.

## LEGAL STANDARDS APPLICABLE TO EXPERT OPINIONS

**I.    The Role of the Trial Court**

Trial courts serve as gatekeepers for expert opinions and are responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).[4] "The party seeking to introduce the expert testimony bears the burden of establishing by a preponderance of the evidence that the proffered testimony is admissible." *S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 503-04 (S.D.N.Y. 2018) (citing *Daubert*, 509 U.S. at 592). Although a district court has "broad discretion to carry out this gatekeeping function," *Navigators Ins. Co. v. Goyard, Inc.*, 608 F.

---

[4]    Unless otherwise indicated, this opinion and order omits internal quotation marks, citations, footnotes, and alterations from quoted text.

Supp. 3d 44, 47 (S.D.N.Y. 2022) (quoting *United States v. Williams*, 506 F. 3d 151 (2d Cir. 2007)),

"exclusion remains the exception rather than the rule." *In re AXA Equitable Life Ins. Co. COI Litig.*,

595 F. Supp. 3d at 250.

## II.    Federal Rule of Evidence 702

Under Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert

and other scientific or technical testimony or testimony based on specialized knowledge:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Rule 702 requires that "expert testimony rest on knowledge, a term that connotes more

than subjective belief or unsupported speculation." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d

531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590). In assessing the admissibility of expert

testimony under Rule 702, courts consider three factors: "(1) the qualifications of the expert to

testify as to a particular matter, (2) the reliability of the methodology and underlying data

employed by the expert, and (3) the relevance of the expert's testimony (*i.e.*, whether the expert's

testimony as to a particular matter will assist the trier of fact)." *Bocoum v. Daimler Trucks N. Am.*

*LLC*, No. 17-CV-7636 (JPC) (BCM), 2022 WL 902465, at *6 (S.D.N.Y. Mar. 28, 2022) (quoting *Nimely*

*v. City of N.Y.*, 414 F.3d 381, 396-97 (2d Cir. 2005)).

A.    Expert Qualifications

"To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004); *see also Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-CV-5803 (JLG), 2013 WL 978980, at *2 (S.D.N.Y. Mar. 12, 2013) ("A witness may be qualified as an expert if he or she possesses specialized knowledge, skill, experience, or education."). "If an expert's training and experience are in a field closely related to the subject matter of the proposed testimony, that showing may be sufficient to meet Rule 702's qualification standards in appropriate circumstances." *In re M/V MSC Flaminia*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *4 (S.D.N.Y. July 28, 2017). "[C]ourts in the Second Circuit liberally construe expert-qualification requirements in consideration of the thrust of the Federal Rules and their general relaxation of traditional barriers to opinion testimony." *Washington v. Kellwood*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015). "Arguments that a proffered expert lacks particular education or other experiential background, go to the weight, not the admissibility, of the testimony." *Crown Cork & Seal*, 2013 WL 978980, at *2.

B.    Reliability of the Expert's Opinion

Once a court concludes that a witness is qualified as an expert, the court next evaluates whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Washington*, 105 F. Supp. 3d at 305 (quoting *Daubert*, 509 U.S. at 597). "If the expert's testimony does not rest on traditional scientific methods, the court may permit testimony where a proposed expert witness bases her testimony on practical experience rather than scientific

10

analysis." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016). "The district court has discretion in evaluating the reliability of an expert's methods and may determine the appropriate criteria for evaluating reliability." *Crown Cork & Seal*, 2013 WL 978980, at *3. "Once the trial court has found the expert's method to be reliable, it is left to the jury to decide what weight to give the expert's opinion." *Id.*

"An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel v. Medtronic*, Inc., 451 F.3d 104, 127 (2d Cir. 2006). A court should disqualify an expert when a flaw in the expert's reasoning or methodology is "large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 284 (E.D.N.Y. 2007) ("Subjective methodology, as well as testimony that is insufficiently connected to the facts of the case, have been relied upon by appellate courts as grounds for rejection of expert testimony."); *see also Crown Cork & Seal*, 2013 WL 978980, at *3 (explaining that "[o]pinion that is connected to existing data only by the *ipse dixit* of the expert need not be admitted" and that "opinion based on unfounded extrapolation, insufficient facts or data, or unsupported suppositions should be rejected"). Courts "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached." *Amorgianos*, 303 F.3d at 266. Nonetheless, "conclusions and methodology are not entirely distinct from one another," and a court may disqualify an expert if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

"As the Second Circuit has noted, district courts should presume expert evidence is reliable." *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). "[D]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility . . . ." *In re Zyprexa*, 489 F. Supp. 2d at 285 (quoting *United States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Crown Cork & Seal*, 2013 WL 978980, at *3 (citing *Daubert*, 509 U.S. at 596).

C.      Relevance of the Expert's Opinion

The third prong of a Rule 702 analysis contemplates whether the expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Washington*, 105 F. Supp. 3d at 307-08. Whether an expert's opinion will be helpful is ultimately an assessment of whether the testimony is relevant to the issues in the case. *See, e.g.*, *Daubert*, 509 U.S. at 591 (explaining that the third prong "goes primarily to relevance"). Rule 401 of the Federal Rules of Evidence provides that evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401.

In deciding whether expert testimony will be helpful to the factfinders, the Court must assess whether the testimony "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (explaining that "expert testimony may help a jury understand unfamiliar terms and concepts," but "[i]ts use must be carefully circumscribed"). While an expert "may opine

12

on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294 (approving the trial court's limiting instruction that the expert on federal securities filing requirements could provide "background concerning the meaning of terms, the procedures which [were] followed, and his opinion as to the reason for [those] procedures" but that he could not "give his opinion as to what the law require[d]"); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). "[T]estimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissible, and may not be made so simply because it is presented in terms of industry practice." *Bilzerian*, 926 F.2d at 1295 (explaining that expert "testimony stating ultimate legal conclusions" would "encroach upon the court's duty to instruct on the law"). Courts therefore disqualify experts to the extent that they "provide[ ] legal opinions, legal conclusions, or interpret[ ] legal terms; those roles fall solely within the province of the court." *Highland Cap. Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 470 (S.D.N.Y. 2005).

Courts also exclude expert testimony that "supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence." *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95 (2d Cir. 2011); *see also LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (rejecting an expert's report that "d[id] no more than counsel for the plaintiff w[ould] do in argument, i.e., propound a particular interpretation of [the] defendant's conduct"). Experts are not permitted to "construct a factual narrative based upon record evidence." *Franchitti v. Cognizant Tech. Sols. Corp.*, No. 21-CV-2174

(JMF), 2025 WL 2123655, at *2 (S.D.N.Y. July 29, 2025); *see also S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (explaining that "[i]t is also inappropriate for experts to become a vehicle for factual narrative" and precluding testimony on such grounds); *In re M/V MSC Flaminia*, 2017 WL 3208598, at *8 (excluding expert testimony that contained "extensive factual narrative"). And experts may not opine on the credibility of fact witnesses or their testimony. *See Nimely*, 414 F.3d at 397 (holding that it is a "well-recognized principle of our trial system that determining the weight and credibility of a witness's testimony . . . belongs to the jury"); *see also United States v. Dugue*, 763 F. App'x 93, 96 (2d Cir. 2019) (affirming decision precluding testimony from an expert witness about the general credibility of cooperating witnesses); *S.E.C. v. Collector's Coffee Inc.*, 552 F. Supp. 3d 427, 432-33 (S.D.N.Y. 2021) (rejecting expert testimony opining about the motive to lie of the other party's key witness); *Scott*, 315 F.R.D. at 45-49 (explaining that experts are not permitted to testify about the parties' motivations or intentions).

## III.    Affirmative Expert Opinions and Rebuttal Expert Opinions

"Evidence can be divided into two categories: that which goes to proof of a party's case in chief, and that which responds or rebuts evidence of an adverse party." *In re Puda Coal Sec. Inc. Litig.*, 30 F. Supp. 3d 230, 252 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016). The "task of a rebuttal expert is different from that of an affirmative expert." *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020). As this Court has explained:

> A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party.

*Id.*; *see also Carroll v. Trump*, No. 22-CV-10016 (LAK), 2023 WL 2652636, at *2 (S.D.N.Y. Mar. 27, 2023) ("Federal Rule of Civil Procedure 26 defines rebuttal expert testimony as testimony intended solely to contradict or rebut evidence on the same subject matter identified in the expert testimony offered by another party."), *aff'd*, 124 F.4th 140 (2d Cir. 2024); *Faulkner v. Arista Recs. LLC*, 46 F. Supp. 3d 365, 386 (S.D.N.Y. 2014) (explaining that rebuttal expert testimony should "explain, repel, counteract or disprove evidence presented by the expert to whom he or she is responding").

Despite the differences between affirmative expert opinions and rebuttal expert opinions, "rebuttal experts must meet *Daubert's* threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Am. Emp. Surplus Lines Ins. Co. v. J.R. Contracting & Env't Consulting, Inc.*, 754 F. Supp. 3d 456, 462-63 (S.D.N.Y. 2024).

### ANALYSIS

Defendants contend that summary judgment should be granted in their favor based on their due diligence defense, arguing that they conducted a reasonable investigation and that "the lawyers involved in the Offering specifically advised the Board that the risk disclosures were accurate and complete." (ECF 135, Defs.' SJ Mem. at 6-9.) Defendants' expert, Harrison, opines that Quanergy "engaged in a customary and appropriate due diligence process in connection with the preparation of the Quanergy Registration Statement," in that, among other undertakings,

Defendants consulted Quanergy's outside counsel and underwriter. (ECF 159-1, Harrison Report ¶ 45.)

Plaintiffs offer Levy as a rebuttal expert witness to counter Harrison's opinions, and in particular to opine whether Defendants (1) "engaged in a customary and appropriate level of due diligence" in reviewing  Quanergy's Offering Documents, and (2) "reasonably relied" on the advice of outside counsel in carrying out Defendants' "obligations to conduct a reasonable investigation and thus develop a reasonable ground" to conclude that the Offering Documents contained no false statements or omissions of material fact. (ECF 144-58, Levy Report ¶ 2.)

Defendants argue that Levy should be disqualified because his testimony meets none of the three requirements of Rule 702: Defendants suggest that Levy is not qualified to opine on the topics at issue; that Levy's opinions are unreliable reflections of personal opinion; and that Levy impermissibly acts as a vehicle to deliver Plaintiffs' preferred version of the facts and improperly assesses witness credibility, which makes his testimony unhelpful and therefore irrelevant to the factfinders. (*See* ECF 154, Defs.' Levy Mem. at 5, 17.) After describing Levy's background and opinions, I address in turn each of Defendants' arguments.

## I.    Levy's Background and Opinions

Levy received a Bachelor of Science from the Wharton School of the University of Pennsylvania and a Master of Business Administration from St. Joseph's University. (*See* ECF 144-58, Levy Report ¶ 4.) Thereafter, he spent nearly five decades working in corporate governance, finance, public reporting, auditing, and accounting. (*See id.*) Levy has been a Certified Public Accountant in Illinois since 1978 and has nearly ten years of accounting experience at several large accounting firms (*see id.*); has been the chief financial officer of four companies and the chief

operating officer of one company (*see id.* Ex. A at 3-4); has served on the boards of directors of fifteen public companies (*see id.* ¶ 5); has served as chair of the audit committees for eight companies, which required him to write and review public filings (*see id.* ¶ 7 & Ex. A at 2-3); was involved in one public offering in his role as a company officer and another in his role as an outside director (*see* ECF 155-2, Levy Dep. Tr. at 47:13-48:15, 49:5-19); and has taught corporate governance for state accounting societies and other organizations since 2005 (*see* ECF 144-58, Levy Report ¶ 6; ECF 155-2, Levy Dep. Tr. at 43:7-44:4). In forming his opinions, Levy reviewed materials including Harrison's expert report, Quanergy's SEC Filings, and deposition testimony with exhibits. (*See* 144-58, Levy Report ¶¶ 1-2, 9; ECF 155-2, Levy Dep. Tr. at 54:3-11.)

Because Plaintiffs offer Levy as a rebuttal expert to Defendants' due diligence expert, Harrison, understanding Levy's opinions requires a description of Harrison's expert report. Harrison opines that:

> Defendants engaged in a customary and appropriate level of due diligence, in accordance with their respective obligations under Federal securities laws, in concluding that the contents of the Quanergy Registration Statement and Prospectus complied with SEC disclosure requirements.

(ECF 159-1, Harrison Report ¶ 61(a).) Harrison also opines that it was "customary and appropriate" for Defendants:

> to rely [on] Cooley's advice in discharging their respective obligations to conduct a reasonable investigation and thereby to develop a reasonable ground to believe, that the statements included in the Quanergy Registration Statement were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

(*Id.* ¶ 61(b).)

17

Levy counters that:

Defendants failed to perform adequate due diligence and failed to conduct a reasonable investigation and thus develop a reasonable ground to believe that the statements in the Offering Documents were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

(ECF 144-58, Levy Report ¶ 12.)

In particular, Levy opines that that the Harrison Report "is premised on his conclusion that an officer or director's wholesale reliance on a company's outside counsel suffices as adequate due diligence," but that "[i]n [Levy's] experience, officers and directors must conduct their own independent due diligence" (*id.* ¶¶ 11-12) and that "Defendants [ ] should have, but failed to": (1) specifically ask outside counsel whether risk disclosures relating to the $15 Million Capitalization Requirement should be included in the Offering Documents and press the issue if the answer was no (*see id.* ¶¶ 11, 44, 47, 53); (2) inform outside counsel and the investment bankers of Quanergy's earlier failed fundraising efforts, ask if those failed efforts should be disclosed in the Offering Documents, and press the issue if the answer was no (*see id.* ¶¶ 49-50); and (3) inform the investment bankers of the risk of delisting for noncompliance with the $15 Million Capitalization Requirement and ask about the materiality of the risk and need for disclosure (*see id.* ¶¶ 33, 36, 52-53).

## II.    Levy's Qualifications

Defendants argue that Levy "lacks the necessary expertise to opine on disclosure obligations or the level of investigation required to satisfy the reasonable investigation defense." (ECF 154, Defs.' Levy Mem. at 2.) Defendants characterize Levy as an accountant who "has never been retained as, testified as, or qualified by any court as an expert witness, let alone in any

18

securities case or one involving the specific disclosure-related issues at the heart of this dispute."

(*Id.*) And Defendants contend that "the sum of Levy's knowledge can be chalked up to only a layman's understanding of corporate governance and the role of Chief Financial Officer." (*Id*. at 6.) Plaintiffs respond by pointing to Levy's nearly five decades of relevant corporate experiences. (*See* ECF 158, Pls.' Levy Opp. at 11.)

"Courts in the Second Circuit liberally construe the expert qualifications requirement," and so an expert is not typically disqualified if "the expert has educational and experiential qualifications in a general field closely related to the subject matter in question," *I.M. v. United States*, 362 F. Supp. 3d 161, 192 (S.D.N.Y. 2019), even if "the witness lacks expertise in the specialized areas that are directly pertinent." *Calltrol Corp. v. LoxySoft AB*, No. 18-CV-9026 (NSR), 2025 WL 2720984, at *4 (S.D.N.Y. Sept. 24, 2025). Levy's education, along with his experience as a chief financial officer and chief operating officer, provide him with insights beyond a layperson's understanding of corporate governance. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 454-55 (S.D.N.Y. 2010) ("*Univ. of Montreal Pension Plan*") (qualifying a rebuttal expert to opine on "the appropriate standards of due diligence for investments in hedge funds" based on his "high-level positions at a number of financial institutions" and his "perform[ance of] audit, accounting and marketing functions for hedge funds while also performing numerous due diligence reviews"); *cf. IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, No. 11-CV-4209 (KBF), 2013 WL 5815472, at *14 (S.D.N.Y. Oct. 29, 2013) (finding that a proposed expert witness was not qualified to testify where the proposed expert did "not have any of the basic graduate education, teaching, or research experience or publications

that would provide the Court some basis to believe that he ha[d] the qualifications necessary to make his opinions reliable").

That Levy has limited previous experience with public offerings generally or with disclosure issues such as those at issue in this case specifically (*see* ECF 154, Defs.' Levy Mem. at 10) is insufficient to justify declining to qualify him as an expert: a "lack of extensive practical experience directly on point does not necessarily preclude an expert from testifying," and "[a] formal education in a particular field is sufficient to qualify a witness as an expert." *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, No. 99-CV-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (holding that the defendants' expert witness was qualified to "render expert opinions in the area of petroleum sales and marketing" because the witness had worked for more than twenty-five years in the petroleum industry, including serving on boards of directors and as a consultant).

Levy's education plus his decades of business experience qualify him to opine on the level of due diligence customarily performed in connection with public offerings. *See Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 454-55. Defendants' arguments about weaknesses in Levy's qualifications "go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-44 (2d Cir. 1995) (affirming the qualification of the plaintiff's expert witness to testify about the causes of the plaintiff's throat condition because the witness was an experienced ear, nose and throat doctor and explaining that it was unnecessary for the witness "to be a specialist in environmental medicine"); *see also S.E.C. v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273 (S.D.N.Y. 2016) (stating that a proposed expert witness "need not have experience or education directly on point" and permitting the witness to testify about a Canadian fund's public securities offering based on the witness' extensive experience in the securities

industry, participation in underwritings for several public offerings for Mexican companies, and comparison of U.S. and Mexican securities industry practices). Defendants' criticisms of Levy's credentials "are properly explored on cross-examination," *Revelation Cap. Mgmt.*, 215 F. Supp. 3d at 274, and do not justify excluding Levy's expert opinion and testimony.

### III.    Reliability of Levy's Opinions

Defendants argue that Levy's opinions are unreliable because he fails adequately to describe his methodology and because his testimony is "[d]evoid of [a]nalyses"; Defendants conclude that Levy's opinions are "ipse dixit." (ECF 154, Defs.' Levy Mem. at 12; ECF 160, Defs.' Levy Reply at 7.) In particular, Defendants criticize Levy for "vaguely cit[ing] his experiences without attempting to identify which experiences, in which roles, or explain how or why such experiences provide a reasonable basis for his conclusions"; Defendants also fault Levy for being unable to "articulate specific examples" despite claiming "he has many years of conducting due diligence." (ECF 154, Defs.' Levy Mem. at 12-13.) And Defendants contend that Levy's opinions are "fundamentally flawed" because they are premised on an incorrect legal standard – the duty of care of a fiduciary under state law. (*Id.* at 15-16.)

Plaintiffs respond that Levy's "methodologies are rooted in his practical experiences in public reporting and corporate governance" and highlight that Defendants have "cite[d] no case supporting their proposition that Mr. Levy must identify a specific past experience." (ECF 158, Pls.' Levy Opp. at 18.) Plaintiffs also argue that Levy is "not opining on legal requirements for disclosure but rather on the conduct of corporate officers and directors in reviewing draft public filings based on his extensive experience standing in their shoes." (*Id.* at 13.) And Plaintiffs assert that Levy's expert report reflects the correct legal standards. (*Id.* at 13-14.) Defendants counter that Levy

made misstatements during his deposition about the relevant standards, which Defendants argue should be disqualifying. (ECF 160, Defs.' Levy Reply at 7-8.)

A "district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos*, 303 F.3d at 265. However, the reliability inquiry for expert testimony is "flexible," and depending on the nature of the testimony, reliability concerns may focus on different factors. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). A "court may permit testimony where a proposed expert witness bases her testimony on practical experience rather than scientific analysis." *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 589 F. Supp. 3d 302, 330 (S.D.N.Y. 2022). In such cases, "where experts draw a conclusion from a set of observations based on extensive and specialized experience, the method [they employ] is the application of experience to facts." *Scott*, 315 F.R.D. at 50. While expert testimony sometimes rests "upon scientific foundations, the reliability of which [may] be at issue," where, as here, the expert's conclusions are based on his work in a particular field, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho Tire*, 526 U.S. at 150.

Defendants' criticism that Levy fails adequately to describe his methodology (*see* ECF 154, Defs.' Levy Mem. at 11-12) is misplaced: Levy's methodology is to apply his experience to the facts of the case. Particularly for a rebuttal expert, who has no obligation to offer "a competing analysis" and whose "opinions may properly concern criticizing that presented by another party," *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. at 29, there is no need for "a model or theory to identify purported flaws in" the opinion of the opposing party's expert. *Henkel v.*

22

*Wagner*, No. 12-CV-4098 (AJN), 2016 WL 1271062, at *12 (S.D.N.Y. Mar. 29, 2016) (denying the plaintiff's motion to preclude testimony of the defendants' expert rebuttal witness for "ha[ving] no method or practice in forming an opinion," because the witness's "expertise" and "review[ ] [of] documents" to arrive at an opinion were sufficient). Levy "needs only h[is] expertise and the method identified at the beginning of h[is] report – namely, reviewing the documents in this case, along with [the defendant's expert] report, and arriving at an opinion" that responds to Harrison's expert report. *Id.*

As required, Levy's conclusions are testable under *Daubert* in the sense that they are "provable (or disprovable) by equivalent testimony by experienced participants in the industry." *Seneca Ins. Co. v. Wilcock*, No. 01-CV-7620 (MHD), 2007 WL 415141, at *9 (S.D.N.Y. Feb. 5, 2007) (permitting an expert to testify about the meaning of certain terms in the insurance industry). Defendants will have a chance to try to discredit Levy's opinions by offering their own expert testimony and by cross-examining Levy. *See Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 464-65 (qualifying a due diligence expert over the objection of the opposing party that the expert's testimony was unreliable, noting that "both parties plan to call due diligence experts who will opine on the custom and practice of conducting hedge fund due diligence" and that the opposing party would have the chance to cross-examine the proffered expert).

Defendants' assertion that Levy "could not articulate specific examples" of times he conducted due diligence (*see* ECF 154, Defs.' Levy Mem. at 13) does not require excluding his expert opinions as unreliable. As Chief Judge Laura Taylor Swain has explained, an industry expert need not "correlate his opinions to specific instances of industry practice that he observed or articulate an objective industry benchmark; the reliability of such an expert's opinion may be

inferred from his experience." *In re Davis N.Y. Venture Fund Fee Litig.*, No. 14-CV-4318 (LTS) (HBP), 2019 WL 11272913, at *6 (S.D.N.Y. July 2, 2019) (qualifying an expert to testify on industry standards concerning a board's approval of an investment advisor agreement).

This Court's reasoning in *University of Montreal Pension Plan* is instructive. There, Judge Shira A. Scheindlin concluded that the testimony of the plaintiffs' rebuttal expert on "the appropriate standards of due diligence for investments in hedge funds" was reliable, notwithstanding the defendants' argument that the expert had not sufficiently linked his experience to his conclusions, because the expert's experience – which included "high-level positions at a number of financial institutions" that required him to  "perform[ ] audit, accounting and marketing functions for hedge funds while also performing numerous due diligence reviews" – "[wa]s sufficiently broad-based." 691 F. Supp. 2d at 454-55, 463; *see also* Fed. R. Evid. 702 advisory committee note to 2000 amendment (explaining that "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience" and that "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony"). Judge Scheindlin addressed the defendants' arguments by explaining that "every case is fact-specific, and every expert is not required to provide the same degree of detail in linking his experience to his conclusions"; Judge Scheindlin concluded that the breadth of the proposed expert's experience "provide[d] a sufficient link between his experience and his opinions to satisfy the reliability requirement of Rule 702." *Univ. of Montreal Pension Plan,* 691 F. Supp. 2d at 464.

To be sure, whether Levy's opinions are reliable presents a closer question than was the case in *University of Montreal Pension Plan.* The proposed expert there, who had performed over fifty due diligence reviews, *see id.* at 463, had significantly more directly relevant experience than

Levy. Levy opines on due diligence standards in the context of a public offering of shares but has been involved in only two public offerings, one of which involved shares and took place 25 years ago and the other of which took place 15 years ago and involved a debt offering. (*See* ECF 155-2, Levy Dep. Tr. at 47:13-48:15, 49:5-19) However, I am mindful of the principle that "courts begin with the presumption that expert evidence is reliable," *Calltrol Corp.*, 2025 WL 2720984, at \*3, as well as of this Court's statements that "lack of extensive practical experience directly on point does not necessarily preclude an expert from testifying," *Cary Oil*, 2003 WL 1878246, at \*2, and that "a court should not exclude otherwise admissible testimony simply because . . . the proposed expert does not have the specialization that the court considers most appropriate." *Chill*, 417 F. Supp. 3d at 250-51. I therefore conclude that Levy's experience, which encompasses decades of service on the boards of public and private companies, including on audit committees, as well as involvement in two public offerings, provides a sufficient link between his background and his opinions for purposes of the Rule 702 reliability analysis. *See Univ. of Montreal Pension Plan,* 691 F. Supp. 2d at 463.

**IV.      Relevance and Helpfulness of Levy's Opinions**

Defendants argue that Levy's testimony is merely "a vehicle for factual narrative" and includes "improper credibility assessments." (ECF 154, Defs.' Levy Mem. at 17.) Defendants therefore conclude that Levy's opinions would not be helpful to a jury and are not relevant. (*See id*. at 16-18.) Plaintiffs counter that "some level of factual review by Mr. Levy is necessary, as reasonable due diligence is a fact-intensive inquiry," and they deny that Levy makes any credibility determinations. (ECF 158, Pls.' Levy Opp. at 20-21.)

The relevance inquiry under Rule 702, like the reliability inquiry, is "flexible*." Crown Cork &*

*Seal*, 2013 WL 978980, at \*2 (citing *Daubert*, 509 U.S. at 594). Additionally,

> as with an expert's qualifications and the reliability of his or her methodology, the liberality of Rule 702 insists that doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.

*Washington*, 105 F. Supp. 3d at 308; *see also Jakobetz*, 955 F.2d at 797.

Because "[i]ndustry practices are not like scientific hypotheses, which can be tested

through trial and error, or logical arguments, which can be analyzed through probing their

underlying premises," *Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 464, Levy's opinions on

due diligence standards and practices would "assist the trier of fact to understand the evidence."

*Athena Art Fin. Corp. v. Certain Artwork by Jean-Michel Basquiat Entitled Humidity, 1982*, No. 20-

CV-4669 (GBD) (VF), 2024 WL 1116083, at \*5 (S.D.N.Y. Mar. 14, 2024) (permitting the intervenor's

expert witness to testify about the plaintiff's due diligence for issuing loans secured by art,

because the expert's testimony "[would] provide relevant context of the market in which [the

plaintiff] made the [loans]"). Specifically, Levy's opinions on due diligence standards and practices

would help the factfinders assess whether Defendants' due diligence was sufficient to permit

Defendants to establish their due diligence defense.

This Court's ruling in *Freedman Normand Friedland LLP v. Cyrulnik*, on which Defendants

rely (*see* ECF 154, Defs.' Levy Mem. at 12-13), is not to the contrary. In *Freedman Normand*

*Friedland,* Judge Koeltl excluded proposed expert testimony on the value of four contingent

lawsuits based on a conclusion that the expert's opinions were unhelpful, because the proffered

expert "provide[d] no basis for his alleged expertise in determining the accuracy of [his]

assumptions," lacked "any legal training," and "ha[d] never placed a valuation on a lawsuit." No.

26

21-CV-1746 (JGK), 2024 WL 2218748, at *2-3 (S.D.N.Y. May 15, 2024). The proposed expert "conceded that he lacked sufficient information to make a determination of all of the contingency matters handled by the [plaintiff law firm]" and "therefore came up with his own test for evaluating individual contingency matters for which he cite[d] no support." *Id.* at *3. As such, the Court found that the expert's opinions amounted "to his own ipse dixit." *Id.* Unlike the proposed expert in *Freedman Normand Friedland*, Levy opines on subject matter closely related to his expertise, and his experience makes his opinion helpful.

Defendants' argument that Levy's report is nothing more than a recitation of the facts of the case (*see* ECF 154, Defs.' Levy Mem. at 17) is not persuasive in light of the fact-intensive nature of any analysis of the adequacy of due diligence. However, two of Defendants' arguments about portions of Levy's testimony are persuasive. Levy explains that customary due diligence requires officers and directors to ask certain questions of counsel, and he opines that Defendants should have asked whether "the risk of failing to meet the $15 Million [Capitalization] Requirement should be included in the Offering Documents." (ECF 144-58, Levy Report ¶ 47.) Levy goes on to say that his review of the record reflects that Defendants failed to ask that question; he therefore concludes that Defendants performed less-than-customary diligence. (*See id.*) Defendants convincingly argue that "a jury does not need expert testimony to understand whether Defendants, in fact, asked questions of counsel about whether to include certain risks." (ECF 154, Defs.' Levy Mem. at 17.)

The parties dispute whether Defendants asked their outside advisors if the risk of falling out of compliance with the $15 Million Capitalization Requirement should be disclosed in the Offering Documents: Plaintiffs assert that Defendants did not ask their outside advisors about that

27

risk. (*See, e.g.*, ECF 158, Pls.' Levy Opp. at 20-21; ECF 154, Defs.' Levy Mem. at 16-18.) In stating that Defendants failed to ask that question, Levy impermissibly recites disputed facts in a way that favors Plaintiffs. *See, e.g., Primavera Familienstifung*, 130 F. Supp. 2d at 529 (explaining that courts exclude expert testimony that "supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence"); *see also LinkCo*, 2002 WL 1585551, at *2 (rejecting an expert's report that "propound[ed] a particular interpretation of [the] defendant's conduct"). Levy may not testify that the record reflects a failure by Defendants to ask their outside advisors certain questions; he may testify using "hypotheticals based on assumptions about testimony in the record." *United States v. Scop*, 846 F.2d 135, 143 (2d Cir. 1988).

Defendants' assertion that Levy makes "improper credibility assessments" (ECF 154, Defs.' Levy Mem. at 17) has force as well. "[D]etermining the weight and credibility of a witness's testimony . . . belongs to the jury," and an expert may not opine "on the credibility of trial testimony from crucial fact witnesses." *Nimely*, 414 F.3d at 397-98 (holding that "the credibility assessments to which [an expert] was allowed to testify should have been excluded by the trial court"). Plaintiffs respond that Levy did not make any credibility assessments, but instead "reviewed and considered" Archambault's testimony. (ECF 158, Pls.' Levy Opp. at 20.) Defendants are correct that Levy went "at least one step" beyond "reviewing and considering" testimony. (ECF 160, Defs.' Levy Reply at 9 (quoting *Nimely*, 414 F.3d at 398).) Levy disputes Archambault's testimony that Defendants asked outside counsel whether to disclose Quanergy's risk of being delisted. (*See* ECF 155-2, Levy Dep. Tr. at 167:2-11, 168:22-169:5.) It is impermissible for Levy to offer his "personal assessment of the credibility of [Archambault's] testimony." (ECF 160, Defs.'

28

Levy Reply at 9 (quoting *Scop*, 846 F.2d at 142).) Levy may not offer testimony on the credibility of

Archambault or any other fact witness.

## **CONCLUSION**

As set forth above, Defendants' Motion To Disqualify (ECF 153) is GRANTED IN PART, in

that Levy may not opine on (1) the disputed factual issue whether Defendants asked their outside

advisors if particular risks needed to be disclosed in the Offering Documents, or (2) the credibility

of Archambault or any other fact witness; the Motion To Disqualify is otherwise DENIED. The Clerk

of Court is respectfully requested to terminate ECF 153.

Dated: December 16, 2025
        New York, New York

SO ORDERED.

**ROBYN F. TARNOFSKY**
**United States Magistrate Judge**

29