UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

SABBY VOLATILITY WARRANT MASTER
FUND, LTD, ET AL.,                           23-cv-601 (JGK)
                    Plaintiffs,

                                             MEMORANDUM OPINON
        - against -                          AND ORDER

KEVIN J. KENNEDY, ET AL.,
                    Defendants.
────────────────────────────────

JOHN G. KOELTL, District Judge:

The plaintiffs — Sabby Volatility Warrant Master Fund Ltd. ("Sabby"), SZOP Multistrat LP ("SZOP"), Alto Opportunity Master Fund-SPC-Segregated Master Portfolio B ("Alto"), and Hudson Bay Master Fund Ltd. ("Hudson") — are purchasers in a public offering (the "Offering") of units consisting of Quanergy Systems, Inc. ("Quanergy") common stock and warrants. They bring this action against Quanergy's officers and directors (the "defendants")[1] under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). The plaintiffs allege that, in connection with a public offering, the defendants made untrue statements of material fact, omitted material facts necessary to make the statements made not misleading, and that the Offering materials otherwise failed to provide adequate disclosure.

The defendants now move for summary judgment dismissing the complaint pursuant to Federal Rule of Civil Procedure 56. ECF

───────────────────────

[1] Kevin J. Kennedy, Patrick Archambault, Jim Disanto, Karen Francis, Tamer Hassanein, Lisa Kelley, Thomas M. Rohrs, and Tianyue Yu.

No. 128. For the following reasons, the defendants' motion is **denied in part** and **granted in part**.

I.

The following facts are based on the parties' Rule 56.1 statements, counterstatements, and supporting papers, and are undisputed unless otherwise noted.[2]

Quanergy was a provider of Light Detection and Ranging ("LiDAR") and three-dimensional perception software solutions. Defs.' Rule 56.1 Statement ("56.1 Statement") ¶ 1, ECF No. 131. In February 2022, Quanergy became a publicly traded company listed on the New York Stock Exchange ("NYSE"). Id. ¶ 2. Around the same time, Quanergy closed a private placement of common stock and announced a $125 million equity line of credit facility with Global Emerging Markets Group ("GEM"). Pls.' Rule 56.1 Counterstatement ("56.1 Counterstatement") ¶ 1, ECF No. 143. Under the share purchase agreement between Quanergy and GEM, Quanergy agreed to maintain its NYSE listing as a condition precedent to any drawdown on the equity line. Id.

Between February 2 and May 31, 2022, Quanergy's common stock price fell from $6.97 to $0.51 per share. Id. ¶ 4. In March 2022, Quanergy received a letter from the NYSE identifying three continued-listing standards: (1) an average market

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

2

capitalization of no less than $50 million over a 30-trading-day period and stockholders' equity of no less than $50 million; (2) an average market capitalization of no less than $15 million over a 30-trading-day period, a minimum threshold for continued listing with no cure period available; and (3) an average closing share price of at least $1.00 over a 30-trading-day period. Id. ¶ 5.

In June 2022, Quanergy announced that it had received a notice from the NYSE that it was not in compliance with the continued-listing standard requiring an average closing share price of at least $1.00 over a consecutive 30-trading-day period, but that it intended to cure the deficiency within the six-month cure period. Id. ¶ 6. In July 2022, Quanergy announced that it had received a second NYSE notice of noncompliance, this time for failing to maintain an average market capitalization of at least $50 million over a consecutive 30-trading-day period, and that it again intended to cure the deficiency within the eighteen-month cure period. Id. ¶ 7.

Quanergy did not disclose, however, that if its average market capitalization fell below $15 million over a 30-trading-day period, it would be subject to immediate delisting without any cure period.

In response to these financial challenges, on June 29, 2022, Quanergy retained Raymond James & Associates, Inc.

("Raymond James") as its financial adviser to explore potential alternatives, including raising capital through debt financing or selling assets. 56.1 Statement ¶ 6. From July through September 2022, Raymond James contacted 118 potential debt-financing counterparties, conducted diligence calls with twenty-six of them, and entered into non-disclosure agreements ("NDAs") with twenty-four. Id. ¶ 7; 56.1 Counterstatement ¶ 10.

The defendants contend that an affiliate of plaintiff SZOP submitted a bid to invest in Quanergy through the Raymond James process, but that Quanergy rejected the bid. 56.1 Statement ¶ 8. The plaintiffs dispute that contention and maintain that an affiliate of SZOP submitted its bid through Cowen and Tharsis Capital, not Raymond James. Pls.' Resp. to 56.1 Statement ¶ 8, ECF No. 142. In any event, no party submitted a credible debt-financing proposal. 56.1 Counterstatement ¶ 10.

In August 2022, the defendants retained Maxim Group LLC ("Maxim") to explore the possibility of a public offering. 56.1 Statement ¶ 13.

In late September 2022, Quanergy retained Young Conaway Stargatt & Taylor LLP ("Young Conaway") as bankruptcy counsel and FTI Consulting, Inc. ("FTI") as an advisory firm. 56.1 Counterstatement ¶ 14. Quanergy paid Young Conaway a $200,000 retainer. Id. ¶ 15. In October 2022, Young Conaway billed Quanergy over $100,000 for 146 hours of work. Id. The plaintiffs

4

contend that these facts support an inference that, before the later public offering, the defendants intended to pursue bankruptcy proceedings and intended to use the proceeds of the later Offering to fund those proceedings. See Pls.' Mem. in Opp'n to Defs.' Mot. ("Pls.' Opp'n") 20, ECF No. 141.

In October 2022, Quanergy's primary counsel, Cooley LLP ("Cooley"), also invoiced Quanergy $234,000 for "Strategic Alternatives" work relating to "liquidation." 56.1 Counterstatement ¶ 16. Quanergy disputes whether that invoice was paid using funds raised in the later Offering. See Defs.' Resp. to 56.1 Counterstatement ¶ 16, ECF No. 150.

On the market close on October 11, 2022, Quanergy's market capitalization fell below $15 million for the first time. 56.1 Counterstatement ¶ 20. On October 18, the NYSE emailed Pat Archambault, Quanergy's Chief Financial Officer; Jerry Allison, Quanergy's General Counsel; and Cooley, warning that Quanergy faced the risk of immediate trading suspension and delisting because it had fallen below the $15 million average market capitalization requirement and that delisting could occur in as little as fourteen days. Id. ¶ 21. On October 20, 2022, Allison emailed defendant Kevin Kennedy and Quanergy's outside counsel, advising that Quanergy faced immediate delisting, with no cure period, if it failed to maintain an average market

capitalization of at least $15 million over the 30-trading-day period. Id. ¶ 22.

On October 26, 2022, Archambault circulated a spreadsheet to Allison, Cooley, and Raymond James setting out "quick math" intended to show how a public offering might address Quanergy's delisting risk. Id. ¶ 23; Price Decl. Ex. 26 ("Quick Math Email"), ECF No. 144-26. Of the six scenarios Archambault modeled, four projected that Quanergy would fall below the $15 million market-capitalization threshold. Price Decl. Ex. 26.

One Quanergy board member testified that Archambault discussed his analysis and calculations with the Board and represented that a public offering would eliminate the risk of delisting. Kelley Decl. ¶¶ 15—16, ECF No. 130-2. The plaintiffs dispute, however, whether Archambault circulated the spreadsheet to the full Board. 56.1 Counterstatement ¶ 23.

The defendants contend that, in the days leading up to the public offering, the Board met up to four times a week with Quanergy's management team and in-house and outside counsel to discuss the risks associated with the Offering and whether the offering materials adequately disclosed those risks. 56.1 Statement ¶¶ 21—33. The defendants further assert that Cooley repeatedly advised the Board that the risk disclosures were more than adequate and that Cooley did not believe Quanergy would be delisted following the Offering. Id. ¶¶ 31—33, 37—39, 44, 49-50.

The defendants similarly contend that Allison advised the Board that no additional disclosure was necessary. Id. ¶¶ 41–42, 45.

The plaintiffs dispute both the occurrence and the substance of these purported Board meetings, noting that the defendants have produced no Board minutes, calendar invitations, or emails reflecting such meetings in October 2022. Pls.' Resp. to 56.1 Statement ¶¶ 21–33. The plaintiffs also point to testimony from several officers and Board members who did not recall any discussions at Board meetings concerning risk disclosures, Raymond James, or the retention of bankruptcy counsel. Id. ¶¶ 28–30, 33.

The plaintiffs further rely on Cooley's November 2, 2022 letter, which states that Cooley did not "independently verif[y]" the statements in the registration statement and "assume[s] no responsibility for the accuracy, completeness or fairness" of those statements. Id. ¶ 49; see Zaccaro Decl. Ex. 2-A, ECF No. 130.

On November 1, 2022, Quanergy filed a final prospectus with the United States Securities and Exchange Commission (the "SEC"). 56.1 Statement ¶ 54; Zaccaro Decl. Ex. 10 ("Prospectus"), ECF No. 130. The prospectus warned of the risk of delisting from the NYSE and described two potential bases for noncompliance: (1) failure to maintain an average closing share price of at least $1.00 over a consecutive 30-trading-day

period, for which the NYSE provided a six-month cure period; and (2) failure to maintain an average market capitalization of at least $50 million over a consecutive 30-trading-day period, for which the NYSE provided an eighteen-month cure period. 56.1 Counterstatement ¶¶ 34—35; Prospectus 51. The prospectus did not disclose, however, that Quanergy faced the risk of immediate delisting — without any cure period — if its average market capitalization fell below $15 million over a 30-trading-day period, the specific risk about which the NYSE had warned Quanergy on October 18. 56.1 Counterstatement ¶ 34.

The prospectus disclosed that, even if Quanergy sold all of the units offered, it would have less than three months of operating expenses on hand and would therefore require additional capital to pursue its business plan. 56.1 Counterstatement ¶ 39; Prospectus 5. The prospectus stated that Quanergy "will need to engage in near-term equity or debt financings to secure additional funds." Prospectus 11. The prospectus did not disclose the Raymond James process or that, as of that time, the process had been unsuccessful in securing financing. 56.1 Counterstatement ¶¶ 38, 41.

The prospectus stated that Quanergy expected to use the net proceeds from the Offering for "general corporate purposes, including working capital, operating expenses and capital expenditures," and further disclosed that Quanergy's management

"will have broad discretion in the application of the net proceeds." Prospectus 44. The plaintiffs contend, however, that the prospectus did not specifically disclose that Quanergy intended to use Offering proceeds to fund bankruptcy-related work for which Quanergy had already incurred hundreds of thousands of dollars in professional fees. 56.1 Counterstatement ¶ 43.

On November 2, 2022, Quanergy conducted a public offering of registered securities (the "Offering") on the NYSE, priced at $1.70 per unit, with each unit consisting of one share of common stock and two warrants. 56.1 Statement ¶¶ 12, 14. The Offering was expected to generate gross proceeds of more than $16 million. Id. ¶ 15.

On October 31, 2022, the plaintiffs collectively purchased an aggregate of 4.485 million units in the Offering for $7,624,500, at a price of $1.70 per unit. See Zaccaro Decl. Exs. 19–22. That same day, Alto and SZOP sold all of the shares they had purchased. 56.1 Statement ¶¶ 65, 67. Hudson purchased 1,175,000 shares on October 31, 2022, and sold 875,000 of those shares the same day. Id. ¶ 66. Hudson sold the remaining 300,000 shares on November 3, 2022. Id. Sabby purchased 1,600,000 shares on October 31, 2022, sold 157,317 shares that same day, and sold an additional 64,567 shares on November 1, 2022. Id. ¶ 68.

On November 8, 2022, Quanergy's stock closed at $0.71, causing its 30-trading-day average market capitalization to fall

to approximately $14.9 million. 56.1 Counterstatement ¶ 46. That same day, the NYSE notified Quanergy that it had determined to commence delisting proceedings because Quanergy was not in compliance with the $15 million market-capitalization requirement, and the NYSE suspended trading and delisted Quanergy's stock and warrants after the market closed on November 8, 2022. Id. ¶ 47.

The plaintiffs contend that they first learned of the $15 million delisting requirement — and the absence of any cure period — the following day, when Quanergy announced the delisting. Id. ¶ 48. The news of delisting caused Quanergy's stock price to plunge to $0.24 per share. Id. ¶ 53.

On December 13, 2022, Quanergy filed a petition for relief under Chapter 11 of the Bankruptcy Code. 56.1 Statement ¶ 80. Between December 13, 2022, and January 31, 2023, plaintiff Sabby sold its remaining 1,368,116 shares at prices ranging from $0.105 to $0.030 per share. See Zaccaro Decl. Ex. 26 ("Sabby Interrogatory Responses") 4-5, ECF No. 130.

This action was filed on January 24, 2023. ECF No. 1. On May 17, 2023, the defendants moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 53. The Court denied that motion. ECF No. 67.

On August 12, 2025, the defendants moved to disqualify plaintiffs' expert, John Levy. ECF No. 153. Magistrate Judge Robyn F. Tarnofsky granted the motion in part, ruling that Levy

10

may not opine on (1) the disputed factual issue whether the defendants asked their outside advisers whether particular risks needed to be disclosed in the offering materials, or (2) the credibility of Archambault or any other fact witness, and otherwise denied the motion. ECF No. 165.

## II.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. However, "disputed legal questions . . . present nothing for trial and are appropriately resolved on a motion for summary judgment." Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the

11

materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. If the movant meets that burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis omitted). At the summary judgment stage, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. See id.

### III.

The defendants argue initially that because they have performed their requisite due diligence, they are exempt from liabilities. Defs.' Mem. in Supp. of Mot. Summ. J. 6-12 ("Defs.' Mem."), ECF No. 129.

Section 11 provides an affirmative defense of "due diligence," which is available to defendants other than the issuer of the security who

> had, after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

15 U.S.C. § 77k(b)(3); In re WorldCom, Inc. Sec. Litig., 346 F. Supp. 2d 628, 682 (S.D.N.Y. 2004).

12

Courts generally require that the defendants "demonstrate that they have conducted a meaningful investigation before granting summary judgment." WorldCom, 346 F. Supp 2d at 677. Such investigation sometimes includes "reviewing the [issuer's] financial statements, forecasts, budgets, and accounting controls, including discussions and/or meetings with management, outside directors, accountants, suppliers, and lending banks." Phillips v. Kidder, Peabody & Co., 933 F. Supp. 303, 318 (S.D.N.Y. 1996), aff'd, 108 F.3d 1370, 1997 WL 138814 (2d Cir. 1997). Moreover, the defendants must make some reasonable attempt to verify the data submitted to them and may not "rely solely on the company's officers or on the company's counsel." Escott v. BarChris Const. Corp., 283 F. Supp. 643, 697 (S.D.N.Y. 1968).

The defendants argue that each of them conducted a reasonable investigation and reasonably relied on the advice of Quanergy's in-house and outside counsel in "believing that the disclosures in the Offering Documents concerning the delisting risk, the Raymond James process, and the use of proceeds were . . . adequate." Defs.' Mem. 7–8. The defendants also contend that Archambault's analysis constituted a reasonable investigation of the Offering and that the Board reasonably relied on that analysis. Id. at 8.

That argument is unpersuasive; the plaintiffs have raised triable issues of fact as to the defendants' due-diligence defense. The $15 million market-capitalization threshold was identified early as a continued-listing requirement. In its March 2022 letter, the NYSE listed three continued-listing standards, including the requirement that Quanergy maintains an average market capitalization of at least $15 million over a 30-trading-day period — a threshold for which no cure period was available. 56.1 Counterstatement ¶ 5. On October 18, 2022, the NYSE also warned that Quanergy had fallen below the $15 million line as of October 11, 2022 and that Quanergy faced the risk of immediate suspension and delisting in as little as fourteen days. Id. ¶¶ 20-21. A reasonable jury could conclude that, given the immediacy of that risk, the Board could not reasonably disregard it based solely on counsel's asserted assurances.

The record also includes Archambault's October 26, 2022 spreadsheet, circulated to Allison, Cooley, and Raymond James—and, according to the defendants, to the Board — addressing precisely how to structure the Offering to avoid falling below the $15 million threshold. Price Decl. Ex. 26. Of the six scenarios Archambault modeled, four projected that Quanergy would remain below $15 million and thus face a likely result of immediate delisting. Id. A jury could reasonably question how the Board could rely on that analysis and yet conclude that omitting

14

disclosure of the $15 million continued-listing requirement and the risk of immediate delisting was immaterial.

The defendants' position depends in part on their asserted reliance on counsel's advice and on purported Board discussions for which, according to the plaintiffs, no contemporaneous minutes or other documentation has been produced to support the proffered testimony. See Pls.' Resp. to 56.1 Statement ¶¶ 21–33. The plaintiffs also point to Cooley's November 2, 2022 letter disclaiming any independent verification of, or responsibility for, the accuracy and completeness of the registration state-ment. See 56.1 Counterstatement ¶ 49; Zaccaro Decl. Ex. 2-A. Viewing the evidence as a whole, the record would permit a rea-sonable jury to question whether the defendants conducted a reasonable investigation in concluding and had reasonable grounds to believe that no disclosure of the $15 million immedi-ate-delisting risk was required, particularly where the offering materials disclosed other continued-listing standards while omitting the $15 million threshold.

Moreover, the record reflects that Quanergy retained Ray-mond James as early as June 29, 2022, and retained bankruptcy counsel Young Conaway and advisory firm FTI in late September 2022, and that Quanergy's officers and directors had extensive interactions with those advisers and incurred significant fees before the final prospectus was filed. See 56.1 Statement ¶¶ 6–

15

7, 14-15; 56.1 Counterstatement ¶¶ 10, 16. Raymond James actively engaged in pursuing potential financing alternatives: contacting 118 potential debt-financing counterparties, conducting diligence calls with twenty-six of them, and entering into NDAs with twenty-four. 56.1 Statement ¶ 7; 56.1 Counterstatement ¶ 10.

Meanwhile, Young Conaway and FTI also performed substantial work before the prospectus was finalized. By October 2022, Young Conaway had billed Quanergy over $100,000 for 146 hours of work, and Quanergy had paid a $200,000 retainer. 56.1 Statement ¶ 15. The plaintiffs argue that the timing and extent of the bankruptcy-related engagements support an inference that the defendants contemplated using Offering proceeds to fund a bankruptcy process — an intent the defendants deny.

Given the scope of Quanergy's engagements with Raymond James and its bankruptcy advisers, notwithstanding the defendants' asserted reliance on in-house and outside counsel, a reasonable jury could conclude that the defendants failed to conduct a reasonable investigation and lacked reasonable grounds to omit any disclosure of the Raymond James process and any

16

disclosure that Offering proceeds would be used to fund bank-ruptcy-related work.

## IV.

The defendants also reprise several arguments raised in their motion to dismiss, contending that the alleged omissions are immaterial, that they had no affirmative duty to disclose the omitted information, and that the challenged statements in the prospectus were inactionable forward-looking statements. Defs.' Mem. 14-22.

## A.

The defendants argue that the omission of the risk of delisting for failure to comply with the $15 million continued-listing requirement is immaterial because (1) the $15 million requirement and Quanergy's market capitalization were publicly available, and (2) the prospectus's existing risk disclosures rendered any additional disclosure immaterial. Defs.' Mem. 15-16.

An omitted fact is material if "there [is] a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). Material facts include those that "affect the probable future of

17

the company and may affect the desire of investors to buy, sell, or hold the company's securities." SEC v. Tex. Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968). "Summary judgment may not be granted on the ground that alleged omissions are immaterial unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 180 (2d Cir. 2001) (quoting Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Defendants' first contention is unpersuasive because the mere public availability of information does not, by itself, render an omission immaterial. The relevant question is whether the omitted facts were part of the "total mix" of information reasonably available to investors. As courts in this Circuit have explained, "the inquiry into whether information is part of the 'total mix' does not end with the revelation that the information was public; rather, the inquiry must turn to whether the investors could have reasonably been aware of the information." Klein ex rel. Ira v. PDG Remediation, Inc., 937 F. Supp. 323, 328 (S.D.N.Y. 1996); see also United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199 (2d Cir. 1993).

Applying that framework here, even if some investors understood that Quanergy faced a risk of delisting for falling under the $15 million market capitalization requirement, a reasonable

18

jury could still find it material whether the prospectus expressly disclosed the specific risk that Quanergy could be delisted without a cure period. A market inference or generalized awareness of regulatory risk is not the same as an issuer's affirmative disclosure in offering materials: an explicit, issuer-authored warning may carry a different weight and convey a different degree of certainty than investors' own predictions drawn from scattered public sources. Moreover, even if the plaintiffs were sophisticated enough to track continued-listing requirements or calculate market capitalization, the materiality inquiry turns on the perspective of the reasonable investor. On this record, reasonable jurors could disagree about whether the omitted disclosure would have altered the "total mix," and thus whether it would have affected reasonable investors' decisions to buy, hold, or sell, particularly when there was no disclosure of the recent warning from the NYSE on October 18, concerning the possibility of an imminent delisting.

As for the defendants' second contention, the Court has already rejected it in denying the motion to dismiss. The Court explained that general cautionary language does not immunize the omission of a specific, known risk:

> The doctrine [of] Bespeak Caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead, when he knows with near certainty that the Grand Canyon lies one foot away.

19

> In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996).

Oral Argument Tr. ("OA Tr.") 46:9-14, ECF No. 69. In this case, the prospectus warned generally of delisting risk and identified the two other noncompliance scenarios with cure periods, but it did not disclose the specific risk of immediate delisting triggered by failure to satisfy the $15 million market-capitalization requirement. That general disclosure does not, as a matter of law, render the omitted risk immaterial.

**B.**

The defendants likewise argue that any omission concerning the unsuccessful Raymond James process is immaterial in light of Quanergy's express disclosures of its financial challenges and other publicly available information. Defs.' Mem. 18-19.

Although the defendants contend that the Raymond James process was publicly available information, that contention does not entitle them to summary judgment. The mere existence of information in the public domain does not, as a matter of law, render an omission immaterial. Klein, 937 F. Supp. at 327-28. A reasonable jury could conclude that disclosure in the prospectus that Quanergy had retained Raymond James to pursue financing alternatives and that the process had not yielded a credible proposal would have altered the "total mix" of information

20

available to investors, even if some related information could be pieced together from scattered public sources.

Nor does Quanergy's general disclosure of financial distress render any additional disclosure regarding the unsuccessful Raymond James process immaterial. The Court already rejected that argument at the motion-to-dismiss stage, holding that the alleged "failure to disclose was, at a minimum, arguably material." OA Tr. 47:21–48:3. There is no basis on the present record to depart from that conclusion.

## C.

The defendants also argue that any alleged misrepresentation or omission concerning Quanergy's expected use of the Offering proceeds is not actionable because the challenged statements were forward-looking and reflected only management's beliefs.

That argument is unpersuasive. Even where a statement concerns future events, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." Rombach v. Chang, 355 F.3d 164, 173 (2d Cir. 2004); MF Global, 620 F.3d at 142. In this case, the plaintiffs point to evidence that, before the Offering, Quanergy had already retained Young Conaway and FTI and had incurred substantial bankruptcy-related professional fees. On the motion to dismiss, the Court concluded that, in light of those incurred

21

fees, "Quanergy should have known that the proceeds of the Offering would be used for bankruptcy-related matters, and that would have been material to a reasonable purchaser of the Offering." OA Tr. 48:19–22.

On the present record, a reasonable jury could find that, at the time the prospectus spoke in general terms about the expected use of proceeds and management's discretion, Quanergy knew that Offering proceeds would likely be used — at least in part — to pay bankruptcy-related expenses that had already been incurred and to fund ongoing bankruptcy preparations. The omission of that present, concrete circumstance is not cured by characterizing the use-of-proceeds discussion as forward-looking. It is therefore sufficient to create a triable issue as to whether the prospectus was materially misleading with respect to Quanergy's intended use of the Offering proceeds in later bankruptcy proceedings.

## V.

Finally, the defendants invoke the "negative causation" defense, arguing that the plaintiffs sold all or a substantial portion of their shares and warrants before Quanergy disclosed on November 8, 2022 that the NYSE had suspended trading and delisted Quanergy's securities. Defs.' Mem. 12–14.

Section 11(e) permits a defendant to reduce the defendant's liability by proving that the depreciation in value resulted

22

from factors other than the alleged material misstatement or omission in the registration statement. 15 U.S.C. § 77k(e); Greenapple v. Detroit Edison Co., 618 F.2d 198, 203 n.9 (2d Cir. 1980). The defendant's burden under Section 11(e) has been characterized as one of "negative causation." Akerman v. Oryx Commc'ns, Inc., 810 F.2d 336, 340 (2d Cir. 1987).

The plaintiffs acknowledge that they sold all of the 4.486 million shares they purchased by November 3, 2022, except for 1,368,116 shares purchased by Sabby that were sold after the public disclosure on November 8, 2022. The plaintiffs contend, however, that the omitted information entered the market before November 8 — through leaks or third-party disclosures — and contributed to the stock-price decline. Pls.' Opp'n 30-31.

That argument is unpersuasive. The defendants are correct that "[t]he price decline before disclosure may not be charged to the defendants." Akerman, 810 F.2d at 342. Although the defendant bears the burden of proving that a price decline was unrelated to the alleged misrepresentations in the registration statement, McMahan & Co. v. Wherehouse Ent., Inc., 65 F.3d 1044, 1049 (2d Cir. 1995), a plaintiff advancing a leak or third-party disclosure theory must point to evidence of "insider trading, premature disclosure to investors, or stock manipulation" to support that theory. Akerman v. Oryx Commc'ns, Inc., 609 F.

23

Supp. 363, 371 (S.D.N.Y. 1984), aff'd in part and remanded, 810 F.2d 336 (2d Cir. 1987).

In this case, the defendants have shown that the alleged corrective disclosure regarding delisting occurred on November 8, 2022, whereas most of the plaintiffs (except Sabby) had sold all of their shares by November 3, 2022. By contrast, the plaintiffs have failed to offer any evidence of prior corrective disclosure, such as insider trading, premature disclosure, stock manipulation, or indeed any evidence that the material information that was not disclosed had seeped into the marketplace before the plaintiffs sold most of their shares by November 3, 2022. The plaintiffs have pointed to no testimony that they knew why Quanergy's stock price fell prior to the delisting and the plaintiffs were unaware of any corrective disclosures or disclosure of negative news about Quanergy before they sold.

The defendants' expert, Dr. William S. Choi, opined: "I have not found any evidence indicating that curative information was released to the market between October 31, 2022 and November 4, 2022. Specifically, I am not aware of any publicly available information during this period regarding (i) the potential of delisting, (ii) the retention of Raymond James and efforts to secure debt financing, or (iii) the use of the proceeds from the Offering, as reported in the news articles or analyst reports." ECF No. 129-1, ¶ 27.

24

The plaintiff failed to develop any contrary evidence. Indeed, although the plaintiffs' expert, Dr. Luke Stein, "believe[s] that it is possible that information related to the Raymond James [process] may have leaked out to market participants" and "contributed to the stock price decline following the 31 October 2022 offering," he identified no evidence to support that conclusion. Zaccaro Decl. Ex. 27 ("Luke Stein Dep.") 72–73, ECF No. 152-2.

Accordingly, because there is no evidence of corrective disclosure, leakage, or third-party disclosure, the defendants have shown a lack of loss causation as to those plaintiffs who sold their shares before the November 8, 2022 disclosure and as to the shares Sabby sold prior to November 8, 2022. The defendants' motion for summary judgment dismissing the claims of Alto, SZOP, and Hudson Bay is therefore **granted**. The defendants' motion is also **granted** as to Sabby's claims to the extent Sabby sold shares before November 8, 2022, and **denied** as to Sabby's claims to the extent Sabby sold shares after November 8, 2022.

### CONCLUSION

The Court has considered all of the parties' arguments. To the extent not specifically addressed, those arguments are either moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment dismissing the claims of Alto, SZOP, and Hudson Bay is therefore **granted**. The defendants'

25

motion is also **granted** as to Sabby's claims to the extent Sabby sold shares before November 8, 2022, and **denied** as to Sabby's claims to the extent Sabby sold shares after November 8, 2022.

The Clerk is directed to close all pending motions in this case.


SO ORDERED.
Dated:    New York, New York
          March 17, 2026

_____
          John G. Koeltl
     United States District Judge

26